Slip Op. 18-27

## UNITED STATES COURT OF INTERNATIONAL TRADE

EREGLI DEMIR VE CELIK
FABRIKALARI T.A.S, et al.,

              Plaintiffs,

      v.

UNITED STATES,

            Defendant,

    and

STEEL DYNAMICS, INC., et al.,

          Defendant-Intervenors.

Before: Mark A. Barnett, Judge
Consol. Court No. 16-00218

**PUBLIC VERSION**

## OPINION AND ORDER

[Granting in Part and Denying in Part Plaintiff's and Consolidated Plaintiffs' Rule 56.2
Motions for Judgment on the Agency Record.]

Dated: March 22, 2018

David L. Simon, Law Office of David L. Simon, of Washington, DC, argued for Plaintiff
Ereğli Demir ve Çelik Fabrikalari T.A.Ş.  With him on the brief was Mark B. Lehnardt,
Mark B. Lehnardt, Esq., of Washington, DC.

Matthew M. Nolan, Arent Fox LLP, of Washington, DC, argued for Consolidated
Plaintiffs Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S.  With him on the brief
was Nancy A. Noonan.

Renée A. Burbank, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S.
Department of Justice, of Washington, DC, argued for Defendant United States.  With
her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E.

Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Brandon J. Custard, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

David C. Smith, Jr. and Joshua R. Morey, Kelley Drye & Warren, LLP, of Washington, DC, argued for Defendant-Intervenor ArcelorMittal USA LLC.  With them on the brief were Paul C. Rosenthal and R. Alan Luberda.
Roger B. Schagrin and Christopher T. Cloutier, Schagrin Associates, of Washington, DC, for Defendant-Intervenors Steel Dynamics, Inc. and SSAB Enterprises LLC.

Stephen A. Jones and Daniel L. Schneiderman, King & Spalding LLP, of Washington, DC, for Defendant-Intervenor AK Steel Corporation.

Jeffrey D. Gerrish and Luke A. Meisner, Skadden Arps Slate Meagher & Flom, LLP, of Washington, DC, for Defendant-Intervenor United States Steel Corporation.

Alan H. Price and Christopher B. Weld, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Corporation.

Barnett, Judge:  Plaintiff Ereğli Demir ve Çelik Fabrikalari T.A.Ş. ("Erdemir") and

Consolidated Plaintiffs Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S.

(together, "Çolakoğlu") (collectively, "Plaintiffs"), move, pursuant to United States Court

of International Trade ("USCIT" or "CIT") Rule 56.2, for judgment on the agency record,

challenging the United States Department of Commerce's ("Commerce" or the

"agency") final results in the sales at less than fair value investigation of certain hot-

rolled steel flat products from the Republic of Turkey.[1]  *See Certain Hot-Rolled Steel*

---

[1] The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 41-4, and a Confidential Administrative Record ("CR"), ECF No. 41-5.  Parties submitted joint appendices containing all record documents cited in their briefs.  *See* Public Joint App. ("PJA"), ECF No. 70; Confidential Joint App. ("CJA"), ECF No. 69; Confidential Suppl. App. of Pl. Erdemir, ECF No. 80; Public Suppl. App. of Pl. Erdemir, ECF No. 81; Çolakoğlu's Confidential Suppl. App. ("Çolakoğlu Suppl. CJA"), ECF No. 82; Çolakoğlu's Non-Confidential Suppl. App. ("Çolakoğlu Suppl. PJA"), ECF No. 83; Çolakoğlu's Confidential Second Suppl. App. ("Çolakoğlu 2nd Suppl. CJA"), ECF No. 85; Çolakoğlu's Non-Confidential Second Suppl. App. ("Çolakoğlu 2nd Suppl. PJA"),

*Flat Products from the Republic of Turkey*, 81 Fed. Reg. 53,428 (Dep't Commerce Aug.

12, 2016) (final determination of sales at less than fair value; 2014-2015) ("*Final*

*Determination*"), ECF No. 41-1, and accompanying Issues and Decision Mem., A-489-

826 (Aug. 4, 2016) ("I&D Mem."), ECF No. 41-3, as amended by *Certain Hot-Rolled*

*Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the*

*Netherlands, the Republic of Turkey, and the United Kingdom*, 81 Fed. Reg. 67,962

(Dep't Commerce Oct. 3, 2016) (am. final affirmative antidumping determinations for

Australia, the Republic of Korea, and the Republic of Turkey and antidumping duty

orders), ECF No. 41-2.

   Erdemir challenges Commerce's determinations regarding its home market and

U.S. dates of sale. *See* Pl.'s Rule 56.2 Mot. for J. on the Agency R., ECF No. 52, and

Mem. in Supp. of Mot. of Pl. Ereğli Demir ve Çelik Fabrikalari T.A.Ş., for J. Upon the

Agency R. Pursuant to Rule 56.2 ("Erdemir Mem."), ECF No. 52-1.  Çolakoğlu

challenges Commerce's determinations regarding duty drawback, indirect selling

expenses, corrections to international ocean freight expenses, cost-averaging

methodology, and treatment of excess heat as a co-product.  *See* Confidential Pls.' Mot.

for J. on the Agency R., ECF No. 53, and Confidential Pls. Çolakoğlu Metalurji A.S. and

Çolakoğlu Dis Ticaret A.S. Mem. of Law in Supp. of Mot. for J. on the Agency R.

Pursuant to Rule 56.2 ("Çolakoğlu Mem."), ECF No. 53-1.  Defendant United States (the

"Government") and Defendant-Intervenors urge the court to sustain Commerce's

---

ECF No. 86.  The court references the confidential versions of the relevant record
documents and briefs, if applicable, throughout this opinion.

determinations.   *See* Confidential Def.'s Mem. in Opp'n to Rule 56.2 Mots. for J. on the

Agency R. ("Gov. Resp."), ECF No. 59; Confidential Def.-Ints.' Resp. in Opp'n to Pls.'

Mots. for J. on the Agency R. ("Def.-Ints. Resp."), ECF No. 61.  For the following

reasons, the court grants Erdemir's motion as to its home market date of sale.  The

court further grants Çolakoğlu's motion as to duty drawback and corrections to

international ocean freight expenses.  Plaintiffs' motions are denied in all other respects.

The issues upon which the court has granted Plaintiffs' respective motions are

remanded to the agency for reconsideration or further explanation.

### BACKGROUND

Commerce initiated this anti-dumping duty investigation of hot-rolled steel flat

products ("hot-rolled steel") on August 31, 2015 in response to petitions filed by

domestic producers of hot-rolled steel.  *See Certain Hot-Rolled Steel Flat Products from*

*Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey,*

*and the United Kingdom*, 80 Fed. Reg. 54,261 (Dep't Commerce Sept. 9, 2015)

(initiation of less-than-fair-value investigations; 2014-2015).  Commerce selected

Çolakoğlu and Erdemir as mandatory respondents in the investigation.  *See*

Respondent Selection Mem. at 5-6, CJA Tab 1.[2]  The period of investigation ("POI") ran

from July 1, 2014 to June 30, 2015.  *Final Determination*, 81 Fed. Reg. at 53,428.

---

[2] The Respondent Selection Memorandum identifies Çolakoğlu and "Iskenderun Demir
Ve Celik" ("Iskenderun") as the mandatory respondents.  Respondent Selection Mem. at
5.  Iskenderun is Erdemir's subsidiary.  *See, e.g.*, Gov. Resp. at 4.

On March 22, 2016, Commerce issued its *Preliminary Determination. See Certain Hot-Rolled Steel Flat Products From the Republic of Turkey*, 81 Fed. Reg. 15,231 (Dep't Commerce March 22, 2016) (aff. prelim. determination of sales at less than fair value; 2014-2015), and accompanying Preliminary Decision Mem., A-489-826 ("Prelim. Mem."), CJA Tab 19, PJA Tab 19, PR 252, ECF No. 69-1.

Commerce conducted sales verifications of Çolakoğlu and Erdemir in Istanbul, Turkey from March 28 through April 8, 2016, and of Çolakoğlu in Houston, Texas, from May 5 through May 7, 2016.  I&D Mem. at 2.  Commerce conducted cost verifications of Erdemir in Eregli, Turkey, from April 18 to April 22, 2016, and of Çolakoğlu in Istanbul, Turkey, from April 25 to April 29, 2016.  *Id.* at 2.

On August 4, 2016, Commerce issued its *Final Determination. See Final Determination*, 81 Fed. Reg. at 53,428.  In the *Final Determination*, Commerce calculated a weighted-average dumping margin of 3.66 percent for Erdemir and 7.15 percent for Çolakoğlu.  81 Fed. Reg. at 53,429.

On October 14, 2016, Erdemir timely instituted this action.  *See* Summons, ECF No. 1.  On October 28, 2016, Çolakoğlu also filed suit challenging *the Final Determination. See* Summons, ECF No. 1 (Court No. 16-232).  On January 18, 2017, the court consolidated the two actions.  *See* Order (Jan. 18, 2017), ECF No. 45.[3]

---

[3] Additional factual and procedural background is contained in the relevant section when helpful to the analysis.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[4] and 28 U.S.C. § 1581(c) (2012).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB.*, 305 U.S. 197, 229 (1938)).  It "requires more than a mere scintilla," but "less than the weight of the evidence."  *Nucor Corp. v. United States*, 34 CIT 70, 72, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)). In determining whether substantial evidence supports Commerce's determination, the court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  However, that a plaintiff can point to evidence that detracts from the agency's conclusion or the possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence.  *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984) (citing *Consolo v. Fed. Mar. Comm'n*, 383

---

[4] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition.

U.S. 607, 619-20 (1966)).  The court may not "reweigh the evidence or . . . reconsider

questions of fact anew." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369,

1377 (Fed. Cir. 2015) (quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta

Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992)).

DISCUSSION

**I.  Erdemir's Rule 56.2 Motion**

**A.  Legal Framework for Date of Sale Determinations**

To determine whether the subject merchandise is being sold at less than fair

value, Commerce compares the export price or, as is the case here, the constructed

export price[5] of the subject merchandise to its normal value.[6]  *See generally* 19 U.S.C.

1673 *et seq.*  Normal value is "the price [of the foreign like product] at a time reasonably

corresponding to the time of the sale used to determine the export price or constructed

export price."  *Id.* § 1677b(a)(1)(A).

The antidumping statute does not state a particular methodology for determining

the "time of sale" for purposes of that comparison.  However, the Statement of

---

[5] Constructed export price is defined as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter," with applicable adjustments pursuant to § 1677a(c) and (d).  19 U.S.C. § 1677a(b).

[6] When, as here, the subject merchandise is sold or offered for sale "for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price," normal value is determined on the basis of home market sales.  19 U.S.C. § 1677b(a)(1)(B).

Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act

defines "date of sale" for the purposes of currency conversion as the "date when the

material terms of sale are established."  Uruguay Round Agreements Act, Statement of

Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 810 (1994), *reprinted in* 1994

U.S.C.C.A.N. 4040, 4153.[7]  Consistent with the SAA, Commerce's regulations prescribe

that "[i]n identifying the date of sale of the subject merchandise . . ., the [agency]

normally will use the date of invoice, as recorded in the exporter or producer's records

kept in the ordinary course of business."  19 C.F.R. § 351.401(i) (2015).  The regulation

further prescribes, however, that "the [agency] may use a date other than the date of

invoice if [it] is satisfied that a different date better reflects the date on which the

exporter or producer establishes the material terms of sale."  *Id.*; *see also Antidumping*

*Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,349 (Dep't Commerce May 19,

1997) ("*Preamble*") ("If [Commerce] is presented with satisfactory evidence that the

material terms of sale are finally established on a date other than the date of invoice,

[Commerce] will use that alternative date as the date of sale").[8]  In other words,

---

[7] The SAA "shall be regarded as an authoritative expression by the United States
concerning the interpretation and application of the Uruguay Round Agreements and
this Act in any judicial proceeding in which a question arises concerning such
interpretation or application."  19 U.S.C. § 3512(d).

[8] In the *Preamble*, Commerce further explains that

> as a matter of commercial reality, the date on which the terms of a sale
> are first agreed is not necessarily the date on which those terms are finally
> established. In [Commerce's] experience, price and quantity are often
> subject to continued negotiation between the buyer and the seller until a
> sale is invoiced. The existence of an enforceable sales agreement
> between the buyer and the seller does not alter the fact that, as a practical
> matter, customers frequently change their minds and sellers are

Commerce's date of sale regulation establishes a "rebuttable presumption" in favor of the invoice date unless the proponent of a different date produces satisfactory evidence that the material terms of sale were established on that alternate date. *Colakoglu Metalurji A.S. v. United States*, 29 CIT 1238, 1240, 394 F. Supp. 2d 1379, 1380-81 (2005); *see also Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 41 CIT____, ___, 256 F. Supp. 3d 1260, 1263 (2017) ("Commerce's date of sale regulation . . . squarely plac[es] the burden on interested parties challenging the presumptive invoice date[] to remove any doubt about when material terms are firmly and finally set . . . .") (citation omitted).

Material terms of sale may include price, quantity, and delivery and payment terms. *See, e.g.*, *Sahaviriya Steel Industries Public Co. Ltd. v. United States*, 34 CIT 709, 727, 714 F. Supp. 2d 1263, 1280 (2010), *aff'd*, 649 F.3d 1371 (Fed. Cir. 2011) (citations omitted).[9]  Commerce also has viewed the specification of an aggregate

_____

> responsive to those changes. [Commerce] also has found that in many industries, even though a buyer and seller may initially agree on the terms of a sale, those terms remain negotiable and are not finally established until the sale is invoiced.

62 Fed. Reg. at 27,348-49.

[9] The Government contends this court *and the U.S. Court of Appeals for the Federal Circuit* ("Federal Circuit") have affirmed Commerce's consideration of payment terms as material terms in the date of sale analysis. Gov. Resp. at 39 (citing, *inter alia*, *Sahaviriya Steel*, 34 CIT 709, 714 F. Supp. 2d 1263, which the Federal Circuit affirmed, 649 F.3d 1371).  In *Sahaviriya Steel*, the CIT favorably referenced *Nakornthai III*, noting that price, quantity, delivery terms and payment terms were among the terms of sale regarded as "material" by Commerce. 34 CIT at 727, 714 F. Supp. 2d at 1280; *see also Nakornthai Strip Mill Public Co. Ltd. v. United States* ("*Nakornthai III*"), 33 CIT 326, 614 F. Supp. 2d 1323 (2009).  On appeal to the Federal Circuit, however, the only issues challenged were whether Commerce properly conducted a changed circumstances

quantity tolerance level as a material term because of its potential to effect quantity.

*See Nakornthai Strip Mill Public Co. Ltd. v. United States*, 32 CIT 553, 561, 558 F.

Supp. 2d 1319, 1327 (2008); *Sahaviriya Steel*, 34 CIT at 727, 714 F. Supp. 2d at 1280.

"[E]vidence that material terms of sale changed after the contract date is relevant to

determining the date on which the parties had a real meeting of the minds." *Nucor*

*Corp. v. United States*, 33 CIT 207, 264, 612 F. Supp. 2d 1264, 1312 (2009) (internal

quotation marks omitted). "In choosing a date of sale, Commerce weighs the evidence

presented and determines the significance of any changes to the terms of sale

involved." *Sahaviriya Steel*, 34 CIT at 728, 714 F. Supp. 2d at 1263; *see also*

*Nakornthai III,* 33 CIT at 336, 614 F. Supp. 2d at 1333 (because Commerce typically

disregards insignificant changes to material terms, the record supporting a finding that

material terms were not set until invoicing must also "support the finding that []

change[s] to the material terms represented in the contract [were] significant").

### B. Commerce's Reliance on the Invoice Date as the Date of Sale for Erdemir's Home Market Sales

#### 1. Factual Background

For home market sales, Erdemir uses an online portal called "ErdemirOnline" to

interact with its customers. *See* Sect. A Questionnaire Resp. of Ereğli Demir ve Çelik

Fabrikalari T.A.Ş. and Iskenderun Demir ve Çelik A.Ş ("Erdemir § A QR") at 19, CJA

Tab 3, CR 25-58, PJA Tab 3, PR 107-113, ECF No. 69.  Erdemir described the sales

---

review and exercised its authority pursuant to a partial revocation.  *See Sahaviriya*
*Steel*, 649 F.3d at 1372-73.

process as: (1) the customer places an order via email or fax stating certain

requirements (including quantity, dimension, thickness, and quality); (2) Erdemir

contacts the customer to review the order; (3) if the order is deemed suitable, Erdemir

transmits to the customer a pro forma invoice via ErdemirOnline, email, or fax, stating

the "order details, delivery details, price information and quotation with sale price and

further information related to time of giving of order guarantee (option time)"; (4) the

customer accepts the order via ErdemirOnline (the "click" date) within a given timeframe

(referred to as "option time").  Erdemir § A QR, Ex. A-08 ("Domestic Terms &

Conditions") ¶¶ 5.1-5.4; *see also* Erdemir § A QR, Ex. A-10 at 4 (screen shot of

customer's acceptance through ErdemirOnline); Erdemir § A QR, Ex. A-10 at 5 (sample

pro forma invoice for a home market sale).

When the order is ready to ship, the customer is notified through ErdemirOnline.

Domestic Terms & Conditions ¶ 9.1.  The actual quantity sold is subject to a leeway or

tolerance based on the ordered quantity.  *Id.* ¶ 9.4.  The tolerances for homes market

sales are: (1) +/-50 percent for orders less than 100 metric tons ("MT"); (2) +/-20

percent for orders 100-150MT; and (3) +/-10 percent for orders above 150MT.  *Id.*[10]

The unit price is stated (in USD/ton) on the pro forma invoice, deviations from which are

not permitted.  *Id.* ¶ 9.2.  The final payable amount constitutes the unit price from the

pro forma invoice, multiplied by the actual tonnage, plus value added tax.  *Id.* ¶ 9.3.

When making payment, the customer may elect to pay in cash or via credited (term)

---

[10] Each coil weighs around 25 tons.  *See* Erdemir § A QR, Ex. A-10 at 1 (sample home
market sales invoice).

payment. *Id.* ¶ 9.4(a)-(b).  If the customer selects a credited payment, it must make a

pre-determined down payment before the payment deadline.  *Id.* ¶ 9.4(b).

### 2. Parties' Contentions

Erdemir contends that Commerce erred in rejecting the "click date" as the date of

sale.  Erdemir Mem. at 17-20.  Commerce reasoned that the payment term (cash or

credited payment) is not fixed until the merchandise is ready to be picked up and the

customer elects a cash or credited payment.  *See id.* at 17-18.  Erdemir contends that

this election is included in the Domestic Terms & Conditions and, therefore, does not

constitute a change.  *Id.* at 18-20; *see also* Confidential Reply Br. in Supp. of Mot. of Pl.

Ereğli Demir ve Çelik Fabrikalari T.A.Ş., for J. Upon the Agency R. Pursuant to Rule

56.2 ("Erdemir Reply") at 1-4, ECF No, 65.  Erdemir further contends that, to the extent

the election of cash or credited payment is considered a "change" to a contract term,

"the change is immaterial because Erdemir receives the same net value [from] the sale

in either event."  Erdemir Mem. at 19; Erdemir Reply at 2.[11]

The Government contends that Erdemir failed to produce sufficient evidence that

the material terms of sale were established upon the "click date."  Gov. Resp. at 36.

The Government further contends that the flexibility afforded by Erdemir's Domestic

Terms & Conditions do not overcome Commerce's regulatory presumption for the

---

[11] Erdemir explains that, for example, receiving "100 dollars today is equivalent to, say, 102.5 dollars at 90 days assuming the term-payment interest rate is 10 percent (100*10%*90/360=2.5)." Erdemir Mem. at 19 (citing Hr'g Tr. (June 23, 2016) ("Hr'g Tr.") at 79-80, CJA Tab 36, PJA Tab 36, PR 319, ECF No. 69-2).  Thus, according to Erdemir, "whether the customer elects to pay $100 today or $102.50 in 90 days is immaterial."  *Id.*

invoice date as the date of sale.  Gov. Resp. at 36; *see also id.* at 37 ("Despite

Erdemir's arguments, the fact remains that payment terms are a material term . . . .").

    Defendant-Intervenors contend that Erdemir's argument regarding the

immateriality of the customer's selection of cash or credited payment term

"misunderstands [Commerce's] date of sale analysis."  Def.-Ints. Resp. at 23.  Pointing

to Commerce's date of sale regulation, Defendant-Intervenors argue that "it is the date

the material terms of sale relied on by [Commerce] are firmly and finally established that

determines the date of sale, regardless of whether Erdemir views the specific terms as

having any 'consequences.'"  *Id.* at 24.

### 3.  Analysis

    In the underlying proceeding, Commerce pointed to Erdemir's fixing of the "total

credit extension amount and per unit amount . . . in the home market sales invoices" to

support its determination that "differences in the material terms of sale between order

and sales invoice [dates]" merited selection of the invoice date as the home market date

of sale.  I&D Mem. at 26 & nn.132-33 (internal quotations and footnote citations

omitted).  Commerce also pointed to its "normal practice" of considering delivery and

payment terms as material terms of sale.  I&D Mem. at 26.  Commerce's conclusory

analysis fails to demonstrate a reasoned decision supported by substantial evidence.

    The payment terms provided in Erdemir's Domestic Terms & Conditions

expressly permit Erdemir's customers to pay by cash or credited payment when the

goods are ready to ship.  *See* Domestic Terms & Conditions ¶ 9.4.  The payment term

does not change in that the *option* to pay by cash or credited payment is withdrawn or

otherwise modified; instead, Erdemir's customers exercise that option at the appropriate

time.  *See id.*; Erdemir Mem. at 18 (Commerce failed to consider evidence that the

payment option "is embedded in the contract itself"); Erdemir Reply at 1 ("Commerce

fails to identify any payment *term* that ever changed . . . .").  Commerce does not

explain why the selection of the payment option at the so-called "ready date," when the

cash or credit terms have been pre-established and are alleged to be economically

equivalent,[12] represents a change to a material term.  *See* I&D Mem. at 26.  *Cf.*

*Nakornthai III*, 33 CIT at 334-36, 614 F. Supp. 2d at 1332-33 (rejecting Commerce's

assertion that the elimination of a line item tolerance level materially alters the contract

merely because tolerance is considered material because it fails to address the

significance of the change).[13]

_____

[12] Erdemir discusses economic equivalence in the context of a hypothetical 100 USD
sale, which it supports by way of reference to a general discussion at Commerce's
hearing in the underlying administrative proceeding.  *See* Erdemir Mem. at 19 (citing
Hr'g Tr. at 79-80); *supra* note 11.  Commerce did not reject Erdemir's proposed date of
sale on the basis of non-equivalence.  *See* I&D Mem. at 26.  Because it is unclear
whether the record contains actual evidence establishing the economic equivalence of
the cash and credit payment terms, the degree to which this principle supports
Erdemir's proposed date of sale is also unclear.

[13] The *Nakornthai III* court nonetheless sustained Commerce's date of sale
determination on the basis of its factual findings regarding the significance of changes
to payment and delivery terms, which were supported by substantial evidence.  33 CIT
at 338, 614 F. Supp. 2d at 1334.  Specifically, a change to a payment term permitted
Nakornthai to receive a large portion of its payment earlier than the date set in the
contract, while changes to the letter of credit's expiration date and last shipment dates
gave Nakornthai additional time to ship the subject merchandise "while still being
entitled to full payment."  *Id.* (citations omitted).  The court noted, however, that it was
not affirming "Commerce's finding [] merely because these material contractual terms
were amended," but on the basis of Commerce's "requisite factual findings of
significance with regard to the change in payment and delivery terms."  *Id.*  In contrast,
here, the optional payment term is not changed or renegotiated, and Commerce has not

The Government's attempt to distinguish *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 33 CIT 695, 735-36, 625 F. Supp. 2d 1339, 1372-73 (2009) is unpersuasive.  Gov. Resp. at 38; *see also* Erdemir Mem. at 19-20 (analogizing *Habas*).  In *Habas*, following a remand, Commerce reversed its prior determination and relied on the contract date as the date of sale despite a post-contract billing adjustment because the adjustment was a late delivery fee to which parties had contractually agreed.  33 CIT at 735-36, 625 F. Supp. 2d at 1373.  The Government asserts that *Habas* is distinguishable because the record in that case reflected a billing adjustment to one sale, whereas here, credit terms for several sales were finalized at the time of invoicing.  Gov. Resp. at 38 (citation omitted).  *Habas*, however, did not rely on the number of sales to which the billing adjustment applied; rather, the court sustained Commerce's determination because the contractual nature of the late delivery fee meant that material terms of sale had not changed.  33 CIT at 735-76, 625 F. Supp. 2d at 1373.  Additionally, to the extent the Government seeks to rely on the number of sales for which credit terms were selected at the "ready date," the Issues and Decision Memorandum lacks any such analysis or reliance.  *See* I&D Mem. at 26; *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (the court may not accept "*post hoc* rationalizations for agency action," and may only sustain the agency's decision "on the same basis articulated in the order by the agency itself").

---

made any factual findings regarding significance.  *See* Domestic Terms & Conditions ¶ 9.4; I&D Mem. at 26; Erdemir Mem. at 18 (the Domestic Terms & Conditions do not "leav[e] room for renegotiating or changing the payment terms").

Defendant-Intervenors' reliance on the *Preamble* to Commerce's date of sale regulation is also unavailing.  Defendant-Intervenors quote a passage stating that certain terms may remain negotiable even after the initial agreement between buyer and seller.  Def.-Ints. Resp. at 23-24 (quoting *Preamble*, 62 Fed. Reg. at 27,348-49).  Here, however, there is no evidence that terms remained negotiable, or that Erdemir's customers changed their minds and were accommodated by Erdemir.  *Cf. SeAH Steel Corp., Ltd. v. United States*, 25 CIT 133, 136 &n.7 (2001) (sustaining Commerce's reliance on the invoice date when the record demonstrated that SeAH permitted a customer to request a *different* payment term between the contract date and invoice date).  Accordingly, the court will remand Commerce's date of sale determination for Erdemir's home market sales for reconsideration or further explanation.

### C. Commerce's Reliance on the Invoice Date as the Date of Sale for Erdemir's U.S. Sales

#### 1. Factual Background

For sales to the United States, customers initiate the sales process through a written or oral inquiry, to which Erdemir responds with a written offer.  Erdemir § A QR at 19.  Erdemir subsequently issues a more detailed sales agreement, pro forma invoice, and technical data sheet specifying price, grade, size, shipping conditions, and quantity, which is then signed by both parties.  *Id.*  The general terms and conditions for U.S. sales accompanying the sales agreement state that it "shall come into force when signed by both parties . . . ." Erdemir § A QR, Ex. A-09 (sample U.S. sales agreement) ("U.S. Terms & Conditions") ¶ 6.1.  The pro forma invoice more specifically states that,

"[u]pon receipt of the Pro-forma Invoice signed by the Buyer, it is at the ultimate

discretion of the Seller to give final confirmation to the Pro-forma Invoice by the signing

the same."  Erdemir § A QR, Ex. A-9 (pro forma invoice) ("Pro Forma") Misc. ¶ 1.

Thereafter, Erdemir's customer issues a letter of credit.  Erdemir § A QR at 19.  If the

letter of credit is untimely, Erdemir has the option to accept or reject the letter of credit;

extending the letter of credit opening term is at Erdemir's sole discretion.  U.S. Terms &

Conditions, Annex 3 ¶ 2.2.  U.S. sales are subject to quantity tolerances in the following

amounts: (1) +/-10 percent for line items over 200MT; (2) +/-10 percent for each lot; and

(3) +/-10 percent for each sale (grand total).  Erdemir § A QR, Ex. A-9 (technical

specifications) ("Tech. Specs.") ¶ 3.2.  For sizes/items equal to or less than 200MT, the

tolerance may exceed +/- 10 percent.  *Id.*

## 2.  Parties' Contentions

Erdemir contends that Commerce erred in rejecting the date upon which it signed

the pro forma invoice as the date of sale on the basis of volume differences, multiple

signature dates, and delays in opening letters of credit because (1) any differences

between the quantities ordered and shipped were immaterial;[14] (2) in accordance with

the U.S. Terms & Conditions and the pro forma invoice, "the only relevant [signature]

---

[14] Erdemir also points to the overall 0.06 percent quantity leeway for all U.S. sales as demonstrating the "insignifican[ce]" of any quantity variance.  *See, e.g.*, Erdemir Mem. at 23.  Because the pertinent inquiry focuses on when the contracting parties had a meeting of the minds as to their respective contracts, volume differences calculated on the basis of all U.S. sales are irrelevant, and the court has—correctly—rejected a similar argument in the past on the basis that it "would render meaningless the quantity tolerance levels negotiated by the contracting parties."  *See Sahaviriya Steel*, 34 CIT at 729, 714 F. Supp. 2d at 1281.

date is the last date—that of Erdemir's signature"; and (3) the U.S. Terms & Conditions permit Erdemir to determine the consequences of an untimely letter of credit, which includes extending the opening term.  Erdemir Mem. at 21-26; Erdemir Reply at 5-12.[15]

The Government contends that "Erdemir's relatively small number of U.S. sales" in conjunction with inconsistencies between the quantities ordered and shipped favored selecting the invoice date.   Gov. Resp. at 41.  The Government further contends that Commerce reasonably determined that the presence of "multiple document dates on the pro forma invoice" meant "that either the material terms changed at the last minute, or were not yet finalized when the document was signed."  Gov. Resp. at 41-42 ("Commerce made a reasonable assumption that the printed date on the pro forma invoice was crossed out because the material terms changed at the last minute, or were not yet finalized when the document was signed.") .  The Government also contends that the failure to timely open the letter of credit "supported the finding that the payment terms set forth in the pro forma invoices not only have the potential to change, but do change."  Gov. Resp. at 39-40; *see also* Def.-Ints. Resp. at 18-19, 21-23 (advancing similar arguments).[16]

---

[15] At oral argument, Erdemir abandoned its argument that the contract provisions permitting partial shipments resolved any quantity differences.  *See* Erdemir Mem. at 22; Oral Arg. at 43:40-45:42.

[16] Defendant-Intervenors also contend that Erdemir used inconsistent language to describe the triggering event giving rise to the date of sale.  *See* Def.-Ints. Resp. at 19-20.  Commerce did not rely on any inconsistent language to support its determination.  *See* I&D Mem. at 27.  Additionally, Erdemir defined the date of sale for U.S. sales as the "contract date," and "reported its pro[ ]forma invoice date as the date of contract" in the "CONDATEU" field.  Sect. C Questionnaire Resp. of Ereğli Demir ve Çelik Fabrikalari T.A.Ş. and Iskenderun Demir ve Çelik A.Ş at 17, CJA Tab 4, CR 78-79, PJA Tab 4, PR

### 3.  Analysis

Commerce articulated three reasons for rejecting the pro forma signature date as

the date of sale.  As discussed below, the court sustains Commerce's determination on

the basis of each of these reasons.

### a.  Volume Differences

Commerce asserted that for "small shipments, U.S. customers are bound to

accept the quantity shipped regardless of the quantity they ordered," and the record

showed differences between the quantities ordered and shipped.  I&D Mem. at 26.

Commerce further explained that "some of Erdemir's larger U.S. sales failed to meet the

tolerance threshold set forth in the terms of sale."  *Id.* at 26 & n.136 (citation omitted).

Commerce noted that, in *Circular Welded Pipe from Taiwan*, differences in the material

terms of just 2 out of 62 sales merited basing the date of sale on the invoice date.  *Id.* at

26-27 (citing *Circular Welded Carbon Steel Pipes and Tubes from Taiwan*, 76 Fed. Reg.

63,902 (Dep't Commerce Oct. 14, 2011) (final results of antidumping duty admin.

review) ("*Circular Welded Pipe from Taiwan*"), and accompanying Issues and Decision

Mem., A-583-008 (Oct. 6, 2011) at Cmt. 1).  Commerce explained that, by that standard,

there were sufficient changes here such that Erdemir failed to establish a date

of sale other than invoice date.  *Id.* at 27.

---

141, ECF No. 69; *see also* Erdemir § A QR at 19.  The "CONDATEU" field in each of
Erdemir's sales verification exhibits correspond to Erdemir's final signature date on the
pro forma invoice.  *See* Sales Verification Exs. ("SVE") 11-14, CJA Tab 28, CR 336,
343-55, PJA Tab 28, PR 273, ECF No. 69-1.  Accordingly, Defendant-Intervenors'
argument lacks merit.

Commerce's reliance on quantity differences for small shipments is unsupported by record evidence.  First, Commerce's reference to "small shipments" is unclear.  The absence of a tolerance applies only to line items below 200MT.  *See* Tech. Specs. ¶ 3.2. None of Erdemir's sales were this small.  *See* Suppl. § B-C Questionnaire Resp. of Ereğli Demir ve Çelik Fabrikalari T.A.Ş. and Iskenderun Demir ve Çelik A.Ş ("Erdemir 2nd Suppl. § BC QR"), Ex. SBC-21, CJA Tab 11, CR 193-246, PJA Tab 11, PR 214, ECF No. 69 (Erdemir Invoice/Contract Sales Comparison).  Moreover, the tolerances applicable to lot and grand totals mean that Erdemir's customers are not "bound to accept the quantity shipped regardless of the quantity they ordered," *see* I&D Mem. at 26, because these aggregate tolerances would still be applicable.

Commerce's reliance on volume differences and Erdemir's purported failure to meet the tolerance thresholds for "larger U.S. sales" supports Commerce's date of sale decision.  While each lot and sale conformed to leeway allowances, two line items in one lot of one sale exceeded the 10 percent tolerance limit for line items above 200MT.  *See* Erdemir 2nd Suppl. § BC QR, Ex. SBC-21.  *Circular Welded Pipe from Taiwan* is, thus, analogous to this case because the record evidences Erdemir's ability to ship items not in conformity with the quantity ordered or the tolerance limits established in the signed pro forma invoice.  *See* I&D Mem. at 26.  This evidence supports Commerce's finding that Erdemir failed to establish that the material terms of sale were set on a date other than invoice date.

### b.  Letter of Credit Opening Dates

Erdemir's U.S. Terms & Conditions require letters of credit to be opened within a particular timeframe.  U.S. Terms & Conditions, Annex 3 ¶ 2.1.  According to Commerce, the failure of several customers to timely open the letters of credit means that payment terms are not final when the pro forma invoice is signed.  I&D Mem. at 27 & n.142 (citing *Welded Line Pipe from the Republic of Turkey*, 80 Fed. Reg. 61,362 (Dep't Commerce Oct. 13, 2015) (final determination of sales at less than fair value), and accompanying Issues and Decision Mem., A-489-822 (Oct. 5, 2015) ("*Welded Line Pipe from Turkey*, I&D Mem.") at Cmt. 9).[17]

In *Welded Line Pipe from Turkey*, Commerce declined to rely on the contract date as the date of sale when the customer's failure to timely establish a letter of credit required amending the contract to "change the letter of credit expiry date and latest date of shipment."  *Welded Line Pipe from Turkey*, I&D Mem. at 24.  Here, while Erdemir's U.S. Terms & Conditions allow Erdemir to accept or reject untimely letters of credit, *see* U.S. Terms & Conditions, Annex 3 ¶ 2.2, the frequency with which customers were untimely in opening the letters of credit and with which Erdemir waived the deadline supports Commerce's decision that Erdemir did not adequately demonstrate that

---

[17] In Erdemir's Final Analysis Memorandum, Commerce explained that [[ ]] out of [[ ]] pro forma invoices failed to reflect letters of credit that were opened within the requisite [[ ]] days, covering [[  ]] out of [[ ]] sales to the United States.  Final Analysis Mem.  for Ereğli Demir ve Çelik Fabrikalari T.A.Ş. and its Affiliates ("Erdemir Final Analysis Mem.") at 3, CJA Tab 39, CR 478, PJA Tab 39, PR 323, ECF No. 69-2 (citing, *inter alia*, Erdemir 2nd Suppl. § BC QR, Ex. SBC-21).

material terms were set on a date other than invoice date, *see* Erdemir Final Analysis

Mem. at 3.

### c. Pro Forma Signature Dates

Commerce also identified a pro forma invoice with different signature dates,

which prevented it "from determining which date should be considered the signature

date for those sales." I&D Mem. at 27;[18] *see also* Erdemir Final Analysis Mem. at 3 &

n.3.[19] Substantial evidence supports Commerce's determination. Specifically, Erdemir

signed the pro forma invoice associated with SVE 11 on two different signature dates:

November 12, 2014 and November 17, 2014. *See* SVE 11. The pro forma invoice

states that Erdemir's signature "give[s] final confirmation" for the sale. Pro Forma, Misc.

¶ 1. It is, therefore, unclear whether the pro forma invoice associated with SVE 11

became "final" on November 12 or November 17. While Erdemir asserts that its "final

signature binds the parties," this is not the only reasonable interpretation of the

---

[18] Commerce's reliance on different *document* dates, however, lacks merit. Commerce opined that a handwritten date replacing a printed date on one of the pro forma invoices "indicates that either the material terms changed at the last minute, or were not yet finalized when the document was signed." I&D Mem. at 27 & n.139 (citing SVE 11). The pro forma invoice associated with SVE 11 shows an original printed date of 11/6/2014, which was crossed out and replaced with a handwritten date of 11/7/2014. *See* SVE 11. However, Commerce does not explain why the amended document date suggests that the material terms changed or were not final when the pro forma was signed on the later date. *See id.*; Pro Forma, Misc. ¶ 1 (stating that the sale is confirmed when the pro forma invoice is signed by Erdemir).

[19] Commerce identified pro forma invoice number [[    ]] as the invoice at issue, Erdemir Final Analysis Mem. at 3 & n.3, which corresponds to the pro forma invoice associated with SVE 11, *see* SVE 11. Commerce's reference to the "[two] pro forma invoices in this exhibit" is, however, mistaken. Erdemir Final Analysis Mem. at 3 & n.3. SVE 11 contains one pro forma invoice numbered [[    ]], with content spanning two pages. *See* SVE 11.

evidence.  *See Matsushita*, 750 F.2d at 933 (the possibility of drawing two inconsistent

conclusions from the evidence does not preclude the agency's finding from being

supported by substantial evidence).[20]  The lack of clarity regarding when the pro forma

invoice associated with SVE 11 became final provides substantial evidence supporting

Commerce's rejection of Erdemir's signature date as the date of sale.[21]  Commerce's

three reasons for its determination to reject Erdemir's proposed date of sale for U.S.

sales are each supported by substantial evidence.

## II.  Çolakoğlu's Rule 56.2 Motion

### A.  Commerce's Denial of Çolakoğlu's Duty Drawback Adjustment

#### 1.  Legal Framework

Pursuant to 19 U.S.C. § 1677a(c)(1)(B), Commerce will increase constructed

export price ("CEP") by "the amount of any import duties imposed by the country of

exportation which have been rebated, or which have not been collected, by reason of

the exportation of the subject merchandise to the United States."  This statutory duty

---

[20] At oral argument, Erdemir asserted that the first of Erdemir's signatures represents the date on which Erdemir made the offer, which was then sent to the customer, who then signed and returned the pro forma invoice for Erdemir's final, and confirmatory, signature.  Oral Arg. at 51:00-52:09.  Even if true, this explanation is not supported by the record evidence that was before Commerce.  Had the customer dated its signature sometime between November 12 and 17, the date of Erdemir's "final confirmation" may have been self-evident.  Because the customer does not appear to have dated the document, Commerce had no way of knowing that Erdemir signed the pro forma before sending it to the customer and upon its return.  *See* SVE 11.

[21] Erdemir signed the other pro forma invoices on a single date.  *See* SVE 12-14. However, it would be impractical to expect Commerce to arrive at different date of sale determinations for different sales, particularly when each review may encompass multiple sales.  *See Toscelik*, 256 F. Supp. 3d at 1263.

drawback adjustment is intended to prevent the dumping margin from being distorted by import taxes that are imposed on raw materials used to produce exported subject merchandise.  *See Wheatland Tube Co. v. United States*, 30 CIT 42, 60, 414 F. Supp. 2d 1271, 1286 (2006), *rev'd on other grounds*, 495 F.3d 1355 (Fed. Cir. 2007); *Allied Tube & Conduit Corp. v. United States*, 29 CIT 502, 506, 374 F. Supp. 2d 1257, 1261 (2005) (citations omitted).

Commerce has developed a two-prong test to determine whether a respondent is entitled to a duty drawback adjustment.  First, the import duty and rebate or exemption must be "directly linked to, and dependent upon, one another"; and, second, the respondent "must demonstrate that there were sufficient imports of the imported material to account for the duty drawback or exemption granted for the export of the manufactured product."  I&D Mem. at 5; *see also Saha Thai Steel Pipe (Public) Co. Ltd. v. United States*, 635 F.3d 1335, 1340-41 (Fed. Cir. 2011) (affirming the lawfulness of Commerce's two-prong test).

"[T]he first prong enables Commerce to verify that the home country allows rebates or exemptions *only* for those imported inputs used to produce exported merchandise," *Wheatland Tube*, 30 CIT at 60, 414 F. Supp. 2d at 1286.  The second prong "requires the foreign producer to demonstrate that it has imported a sufficient amount of raw materials to account for the drawback received upon export of the finished product."  *Id.* (citation omitted).  The respondent bears the burden of proving its eligibility for the duty drawback adjustment.  *See, e.g.*, *Allied Tube*, 29 CIT at 506-07, 374 F. Supp. 2d at 1261.

## 2.  Procedural Background

Çolakoğlu first responded to Commerce's questions regarding duty drawback in

its initial questionnaire response filed on December 9, 2015.  *See* Questionnaire Resp.

of Çolakoğlu Metalurgi, A. Ş, and its Affiliates to Sect. C of the U.S. Dep't of Commerce

Antidumping Duty Questionnaire ("Çolakoğlu § C QR") at C-32 - C-34, CJA Tab 6, CR

125-26, PJA Tab 6, PR 158-60, ECF No. 69.  On January 21, 2016, Commerce issued

a third supplemental questionnaire, and for the first time, asked for additional

information about Çolakoğlu's duty drawback calculation.  *See* Third Suppl.

Questionnaire ("Çolakoğlu Third Suppl. § BC Questionnaire") at 6, CJA Tab 8, CR 162,

PJA Tab 8, PR 190, ECF No. 69.[22]  Çolakoğlu responded to Commerce's supplemental

questionnaire attaching, *inter alia*, three exhibits supporting its duty drawback request.

*See* Part II of Questionnaire Resp. of Çolakoğlu Metalurgi, A.S, and its Affiliates to Third

Suppl. Sects. B and C of the U.S. Dep't of Commerce Antidumping Duty Questionnaire

("Çolakoğlu Third Suppl. § BC QR Part II"), Ex. SBC-13a (copies of IPRs), CJA Tab 15,

CR 275-79, PJA Tab 15, PR 223-25, ECF No. 69; *id.*, Ex. SBC-13c (revised duty

---

[22] Commerce specifically asked Çolakoğlu to provide (1) copies of the relevant Turkish IPRs ("Inward Processing Regime"); (2) an excerpt from the Turkish Customs code describing a particular HS ("Harmonized System") code supporting "the amount of the import duty rate"; (3) a detailed explanation of Çolakoğlu's calculation with supporting documentation; (4) an explanation of Çolakoğlu's linkage of its total exports included in the calculation to each "specific IPR number"; (5) documentation "link[ing] the duty drawback and the exempted duties directly to specific U.S. sales"; and (6) further explanation regarding the total export quantity "reported in Çolakoğlu's Section C U.S. sales database."  Çolakoğlu Third Suppl. § BC Questionnaire at 6.  Commerce also asked Çolakoğlu to clarify whether it procures slab from Turkish or foreign sources (or both).  *Id.*

drawback calculation); *id.*, Ex. SBC-13d (a copy of an extract obtained from the Turkish

Ministry of Economy online system covering U.S. sales).

Commerce preliminarily determined not to grant Çolakoğlu a duty drawback

adjustment on the basis that certain documents were illegible or insufficiently translated,

and "failed to establish a link between the imported inputs and the duties exempted

upon export because there was no evidence that the inputs subject to the IPR were

used in exported subject merchandise." Prelim. Mem. at 13 & n.58 (explaining that

"Çolakoğlu's documents could not  be tied to an official Turkish government source").

Commerce, therefore, concluded that Çolakoğlu had failed to satisfy the first of its two-

prong test. *Id.* at 13.

Çolakoğlu "offer[ed] to provide better quality copies of certain documents" on the

first day of verification, Çolakoğlu Protest Regarding Dep't Refusal to Verify Duty

Drawback (April 4, 2016) ("Çolakoğlu April 4 Protest") at 1-2, CJA Tab 25, PJA Tab 25,

PR 267, ECF No. 69-1, but Commerce declined the documents and refused to verify

Çolakoğlu's request for the duty drawback adjustment, I&D Mem. at 7.  Çolakoğlu

protested Commerce's refusal. *See, e.g.*, Çolakoğlu April 4 Protest.

### 3.  Parties' Contentions

Çolakoğlu contends (1) that substantial evidence demonstrates that it has met

both requirements of Commerce's two-prong test; (2) Commerce should have informed

it that certain submissions related to its duty drawback request were deficient and

provided an opportunity to remedy or explain the deficiency; and (3) Commerce should

nonetheless have verified the adjustment.  Çolakoğlu Mem. at 12-23; Confidential Reply

Br. of Consolidated-Pls. Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S.

("Çolakoğlu Reply") at 2-12, ECF No. 64.

The Government contends that Commerce correctly declined the adjustment

because Çolakoğlu failed to show "that its inputs . . . were used to manufacture

exported subject merchandise," and the incomplete translations and illegibility of certain

record documents meant that "Commerce could not ascertain if the slabs imported by

Commerce were indeed the types of slab necessary to produce hot-rolled steel."  Gov.

Resp. at 12-13.  The Government further contends that Commerce gave Çolakoğlu

several opportunities to submit documents demonstrating its entitlement to the

adjustment, Çolakoğlu "knew or should have known that it submitted [deficient

documents]," and Commerce's statutory responsibility to inform respondents of deficient

submissions must be read in light of the respondent's burden to "provide Commerce

with an accurate submission within the prescribed statutory deadline."  *Id.* at 16-18. The

Government also contends that Commerce correctly declined to verify the adjustment

because the information Çolakoğlu provided was "not capable of verification."  *Id.* at 19.

Defendant-Intervenors contend that Commerce correctly determined that

Çolakoğlu was not entitled to the duty drawback adjustment, and Commerce "was not

required to direct Çolakoğlu to submit documentation establishing the authenticity of the

information it submitted on the record."  Def.-Ints. Resp. at 29.  Defendant-Intervenors

further contend that the submitted documents, even if accepted, did not establish the

necessary link, and Commerce correctly declined to verify the adjustment.  *Id.* at 30, 31-

34.

### 4. Analysis

Çolakoğlu contends that substantial evidence supports granting the duty drawback adjustment. *See* Çolakoğlu Mem. at 12-18. The relevant inquiry for the court's review however, is whether Commerce's decision to deny the adjustment is supported by substantial evidence. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). Commerce's decision rests on its determination that Çolakoğlu failed to meet the first prong of the agency's two-prong test. *See* I&D Mem. at 5 ("Çolakoğlu . . . fail[ed] to establish a link between the imported inputs and the duties exempted upon export . . . ."). However, Commerce has failed to articulate a clear standard by which it determines whether that link has been met, and Commerce's reasons for finding that Çolakoğlu failed to meet the test are unsupported by substantial evidence.

As to the first prong, Commerce explained that it seeks only "a reasonable link between the duties imposed and those rebated or exempted"; it does "not require that the imported material be traced directly from importation through exportation." *Id.* at 4. Commerce goes on, however, to present different measures for substantiating its "reasonable link," somewhat interchangeably, without addressing the distinct evidentiary burdens of each. Specifically, Commerce stated that Çolakoğlu failed to demonstrate (1) that "the inputs [slab] subject to the IPR *were used* to manufacture the exported subject merchandise," (2) "that the particular export *was made* with the slab imported under the same IPR," (3) whether the "slabs . . . were indeed *the types of slabs* necessary for the production of hot-rolled steel," or (4) that "the imported slab *can be used and was used* to make the final product." *Id.* at 5-6 (emphasis added). Commerce

further stated that "[i]n prior Turkish cases, [it] has required that there be evidence on the record that the imported inputs can be used in the production of the final product." *Id.* at 5 & n.16 (citing *Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41,971 (Dep't Commerce July 18, 2014) (final determination of sales at less than fair value and aff. final determination of critical circumstances, in part), and accompanying Issues and Decision Mem., A-489-816 (July 10, 2014) ("*OCTG from Turkey*, I&D Mem.") at Cmt. 1); *Steel Concrete Reinforcing Bar From Turkey*, 79 Fed. Reg. 54,965 (Dep't Commerce Sept. 15, 2014) (final neg. determination of sales at less than fair value and final determination of critical circumstances), and accompanying Issues and Decision Mem., A-489-818 (Sept. 8, 2014) at Cmt. 1); *cf.* Gov. Resp. at 13-14 (asserting that Çolakoğlu failed to show that the imported slabs and exported hot-rolled steel shared "certain metallurgical characteristics, such as carbon content").

There is a difference between demonstrating that specific imports of slab *were used* to produce specific exports of hot-rolled steel, and demonstrating that the slab imported under the Turkish IPR *is suitable for producing* hot-rolled steel.  Commerce's citation to prior Turkish cases fails to clarify the applicable standard.  In *OCTG from Turkey*, for example, the agency granted the adjustment when "[e]ach respondent demonstrated that when it opened the DIIBs,[23] it documented 1) projected quantities of imports, which qualify based on an 8-digit level HTS ["Harmonized Tariff Schedule"] number (which include API-5CT coil used for OCTG) . . . ."  *OCTG from Turkey*, I&D

---

[23] "DIIBs" is another term for Turkey's Inward Processing Regime.  Prelim. Mem. at 13.

Mem. at Cmt. 1; I&D Mem. at 5 n.16.  Commerce further justified the adjustment on the

basis that "each respondent ha[d] demonstrated that the Turkish Government *approved*

and maintained DIIBs through the IPR which documented exports of OCTG to the

United States."  *OCTG from Turkey*, I&D Mem. at Cmt. 1 (emphasis added).  So too

here, Çolakoğlu provided information for each IPR documenting what appear to be HTS

codes (referred to as "GTIP" codes) for the imported slab and corresponding exports.

*See, e.g.*, Çolakoğlu Third Suppl. § BC QR Part II, Ex. SBC-13a (IPR 2923, p.6).

Çolakoğlu also demonstrated the Turkish Government's approval of each IPR on the

basis that the duty free imports were used to produce the exported material.  *See, e.g.*,

*id.* (IPR 2923, p.1).  Commerce's explanation and conclusory citations to prior rulings

fail to apprise the court of the precise standard it seeks to apply in this case, and

whether that standard is consistent with—or departs from—its prior rulings.  *See RHP*

*Bearings Ltd. v. United States,* 288 F.3d 1334, 1347 (Fed. Cir. 2002) ("[A]n agency

action is arbitrary when the agency offers insufficient reasons for treating similar

situations differently.") (citation omitted).

　　　At oral argument, the Government explained that obtaining the adjustment

requires more than demonstrating eligibility for the duty drawback pursuant to Turkish

law, but less than a direct tracing of an input from import to export.  The Government

further stated that Çolakoğlu's documentation failed to apprise Commerce of certain

metallurgical characteristics or otherwise indicate that the imported slabs were the types

of slabs used to produce hot-rolled steel.[24]  Oral Arg. at 1:20:15-1:28:15.[25]  The

Government's oral presentation suggests that Commerce's references to the actual use

of imported slab in exported hot-rolled steel were mistaken and should be understood

as speaking to the suitability of the imported slab.  The court may not accept "*post hoc*

rationalizations for agency action," and may only sustain the agency's decision "on the

same basis articulated in the order by the agency itself."  *Burlington Truck Lines,* 371

U.S. at 168–69.  Commerce's rationale is unclear and insufficiently moored to past

practice.  For that reason alone, a remand is required for Commerce to clarify its

standard for determining eligibility for the duty drawback adjustment.  However,

Commerce's stated reasons for failing to find the first prong satisfied also lack merit.

Commerce first points to partial translations and the illegibility of certain

documents on the record.  I&D Mem. at 5.  Commerce explained that it was not required

to issue a supplemental questionnaire because Çolakoğlu bore the burden of

demonstrating eligibility for the adjustment, and it had "ample opportunity" to do so.  I&D

Mem. at 6-7.[26]  It is true that respondents bear the burden of demonstrating eligibility for

---

[24] As noted by the Government, the Federal Circuit has affirmed Commerce's denial of a duty drawback adjustment even though the Turkish Government granted certain imports duty free status.  *See Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S.*, 861 F.3d 1269 (Fed. Cir. 2017).  In that case, however, the respondent's imports were incapable of use in the subject merchandise.  *Id.* at 1271.  Instead, the Turkish Government granted duty free status on the basis of equivalency, "whereby similar products may be substituted for each other for drawback purposes."  *Id.*at 1271-72.

[25] Citations to the oral argument reflect time stamps from the recording.

[26] Commerce also faults Çolakoğlu for failing to "request[] an opportunity to place new factual information . . . on the record prior to the *Preliminary Determination*."  I&D Mem. at 7.  It was not until the *Preliminary Determination*, however, that Commerce alerted Çolakoğlu to the deficiencies with regard to its documentation.  *See* Prelim. Mem. at 13.

a duty drawback adjustment, *see Allied Tube*, 29 CIT at 506-07, 374 F. Supp. 2d at

1261, and submitting accurate information, *see* 19 U.S.C. § 1677m(b).  If, however,

Commerce

> determines that a response to a request for information under this subtitle
> does not comply with the request, [Commerce] *shall* promptly inform the
> person submitting the response of the nature of the deficiency and *shall*,
> to the extent practicable, provide that person with an opportunity to
> remedy or explain the deficiency in light of the time limits established for
> the completion of investigations or reviews.

19 U.S.C. § 1677m(d) (emphasis added).  Commerce did not address the requirements

of § 1677m(d).  *See* I&D Mem. at 6-7.  Commerce's assertion that Çolakoğlu had

several opportunities to submit factual information demonstrating eligibility for the

adjustment appears to overlook the procedural record of this case.  Çolakoğlu provided

information regarding duty drawback in its initial questionnaire response, and it was not

until Commerce issued a third supplemental questionnaire to Çolakoğlu that it sought

any additional information regarding duty drawback.  *See* Çolakoğlu § C QR at C-32 -

C-34; Çolakoğlu Third Suppl. § BC Questionnaire at 6.  The Government's suggestion

that Commerce's statutory obligation is mitigated by the respondent's burden to provide

accurate information runs counter to the mandatory nature of § 1677m(d).  *See* Gov.

Resp. at 16.[27]  Commerce erred in failing to inform Çolakoğlu that its supplemental

---

[27] The Government cites *NSK Ltd. v. United States*, 17 CIT 590, 593, 825 F. Supp. 315, 319 (1993) and *Chinsung Indus. Co. v. United States*, 13 CIT 103, 106-07, 705 F. Supp. 598, 601 (1989) in support of the proposition that 19 U.S.C. § 1677m(d) "must be read in the context of a respondent's burden to prepare and provide Commerce with an accurate submission within the prescribed statutory deadline."  Gov. Resp. at 16. Neither case, however, addresses § 1677m(d) or otherwise recognizes any limitations on the statute's mandatory language.  The Government also relies on *Papierfabrik*

submission was deficient or make findings with regard to the practicability of providing

Çolakoğlu with an opportunity to remedy or explain the deficiencies. [28]

Commerce also points to the lack of an official Turkish government seal, stamp,

or identifying marker on documents "showing the amount of imported slab and exported

finished hot-rolled steel." I&D Mem. at 5. Commerce did not cite any request or past

practice requiring an official seal on a document appended to a questionnaire response,

or otherwise explain why it declined to inform Çolakoğlu of the deficiency pursuant to 19

U.S.C. § 1677m(d) or otherwise confirm the documents' authenticity at verification. *See*

I&D Mem. at 5.[29] This particular basis is entirely conclusory and, thus, lacking in

reasoned explanation.

---

*August Koehler SE v. United States*, 843 F.3d 1373 (Fed. Cir. 2016), as support for the proposition that Çolakoğlu "was, or should have been [aware]" of the deficiencies. Gov. Resp. at 17. *Papierfabrik*, however, relied on the respondent's actual awareness of certain deficiencies caused by its intentionally fraudulent responses to affirm Commerce's decision not to issue a supplemental questionnaire pursuant to § 1677m(d). 843 F.3d at 1384. As the Government recognizes, the instant case does not involve fraud, Gov. Resp. at 17, and *Papierfabrik* does not support a finding that § 1677m(d) is limited by what a respondent "should have" known. Finally, the Government points to a respondent's burden to provide complete translations pursuant to 19 C.F.R. § 351.303(e). Gov. Resp. at 17. However, Commerce did not rely on Çolakoğlu's purported failure to comply with the regulation when it declined the adjustment, and in fact, considered those portions of certain documents that were legible as part of its decision to deny the adjustment. *See* I&D Mem. at 5-6.

[28] The court's finding is based on the particular facts of this case in which only one or two pages of a multi-page exhibit were difficult to read and a substantial portion of each document was translated. Defendant does not suggest that any asserted shortcomings were intentional and this would appear to be a textbook case for why § 1677m(d) exists—to ensure that respondents have an opportunity to address minor deficiencies in the course of a proceeding.

[29] The Government confirmed at oral argument that Commerce does not have such a policy. Oral Arg. at 1:37:10-1:37:20. The Government also asserted that Commerce had discretion to verify the document's source at verification, but that the duty drawback

Commerce further points to discrepancies in the quantities and values of the imported material and the exported product in the legible and translated portions of the IPR closing documents in Exhibit SBC-13a as compared to Çolakoğlu's duty drawback calculation worksheet contained in Exhibit SBC-13c.  I&D Mem. at 5-6 & nn.17-18 (citing Çolakoğlu 3rd Suppl. § BC QR Part II, Exs. SBC-13a and SBC-13c).  There are slight discrepancies in the value of the imported inputs for two of the IPRs, *compare* Çolakoğlu 3rd Suppl. § BC QR Part II, Ex. SBC-13a (IPR 484, p.1 and IPR 4246, p.1), *with id.*, Ex. SBC-13c (total purchases for each IPR),[30] and discrepancies in the quantity of imports and exports for each IPR.[31]  Nowhere, however, does Commerce explain the materiality of these discrepancies for the purpose of demonstrating whether the imports can (or were) used to produce the subject merchandise.  *See* I&D Mem. at 5-6.  At oral argument, the Government and Defendant-Intervenors both suggested that each basis for Commerce's determination should not be viewed in isolation, but as one of several factors that, together, merited Commerce's decision to deny the adjustment.  *See* Oral Arg. at 1:48:05-1:49:51, 1:49:58-1:50:08.  Such an approach, however, obfuscates the

---

issue as a whole was not verified.  Oral Arg. at 1:37:40-1:38:37.  Commerce's decision not to verify duty drawback is discussed *infra*.

[30] Commerce relied, in part, on a discrepancy in the values of imported slab for IPR 2923.  I&D Mem. at 5 n.17.  That "discrepancy," however, appears to stem from Çolakoğlu's rounding of the value.  *Compare* Çolakoğlu 3rd Suppl. § BC QR Part II, Ex. SBC-13a (IPR 2923, p.1 (referring to an import value of $[[          ]]), *with id.*, Ex. SBC-13c at p.7 (referring to an import value of $[[          ]] for IPR 2923).

[31] The import and export quantities contained in the IPR supporting documents (page 6 of each IPR) do not correspond to the import and export quantities stated in Çolakoğlu's duty drawback calculation worksheet.  *See* Çolakoğlu 3rd Suppl. § BC QR Part II, Exs. SBC-13a, SBC-13c at p.7.

weakness of each basis that, individually and together, fail to support Commerce's

determination.

Finally, Commerce refused to verify Çolakoğlu's duty drawback request because

Çolakoğlu's original submission was "too deficient to rely upon and thus not capable of

verification."  I&D Mem. at 7.[32]  As discussed above, however, Commerce's refusal to

verify the adjustment is predicated on faulty reasoning and a failure to adhere to its

statutory obligation concerning deficient submissions.  The agency's assertion that the

record information was "too deficient" for verification is unsupported by substantial

evidence because Commerce failed to inform Çolakoğlu of the deficiency or make

findings with regard to the practicability of providing Çolakoğlu with an opportunity to

remedy or otherwise address the deficiencies.  *See* 19 U.S.C. § 1677m(d).

Commerce claimed that accepting Çolakoğlu's documents at verification would

have constituted "the acceptance of a new questionnaire response . . . in a time period

---

[32] By statute, Commerce
   shall not decline to consider information that is submitted by an interested
   party and is necessary to the determination but does not meet all the
   applicable requirements . . . if--
   (1) the information is submitted by the deadline established for its
   submission,
   (2) the information can be verified,
   (3) the information is not so incomplete that it cannot serve as a reliable
   basis for reaching the applicable determination,
   (4) the interested party has demonstrated that it acted to the best of its
   ability in providing the information and meeting the requirements
   established by the administering authority or the Commission with respect
   to the information, and
   (5) the information can be used without undue difficulties.
19 U.S.C. § 1677m(e).

[Çolakoğlu] established" rather than the agency's deadlines, which would have "precluded the [agency] from analyzing the information thoroughly and . . . denied other parties . . . the opportunity to comment meaningfully." I&D Mem. at 7. However, "[r]emedying any deficiency in a questionnaire response typically will require submission of new information." *China Kingdom Import & Export Co., Ltd. v. United States*, 31 CIT 1329, 1350, 507 F. Supp. 2d 1337, 1356 (2007). Further, Çolakoğlu attempted to submit the documents in response to Commerce's initial identification of its inability to read certain exhibits, and not at some arbitrary time Çolakoğlu unilaterally established. *See* Prelim. Mem. at 13 (dated March 14, 2016); Çolakoğlu April 4 Protest at 1-2; *cf. China Kingdom*, 31 CIT at 1350, 507 F. Supp. 2d at 1356–57 ("A mere finding that the remedy would require Commerce to consider new information [presented at verification] is not commensurate with a finding that allowing the interested party to effect the remedy would be impracticable under the circumstances, given the statutory time limits.").

In sum, Commerce's decision to deny Çolakoğlu's request for a duty drawback adjustment was based on its procedural missteps and inconsistent and conclusory analysis that, as a whole, renders its determination lacking substantial evidence and reasoned explanation. Accordingly, it will be remanded for reconsideration.

## B. Commerce's Denial of a Quarterly Cost-Averaging Methodology

### 1. Legal Framework

Commerce calculates the normal value of the subject merchandise on the basis of home market sales that are made "in the ordinary course of trade." 19 U.S.C.

§ 1677b(a)(1)(B)(i).  Commerce, therefore, disregards sales at prices that are less than

the cost of production, *id.* § 1677b(b)(1), because those sales are not made within the

ordinary course of trade, *id.* § 1677(15)(A).  The cost of production "equal[s] of the sum

of . . . the cost of materials and of fabrication or other processing of any kind employed

in producing the foreign like product, during a *period* which would ordinarily permit the

production of that foreign like product in the ordinary course of business."  *Id.*

§ 1677b(b)(3)(A) (emphasis added).[33]

The statute does not define the "period" to be used or the method by which

Commerce must calculate the costs of production.  *SeAH Steel Corp. v. United States*,

34 CIT 605, 614, 704 F. Supp. 2d 1353, 1361 (2010).  Commerce's usual methodology

is to rely on "an annual weight-average cost" for the period of investigation.  I&D Mem.

at 13.  Commerce may depart from its usual methodology and rely on quarterly cost-

averages when "significant cost changes are evident [and] . . . sales can be accurately

linked with the concurrent quarterly costs."  *Pastificio Lucio Garofalo, S.p.A. v. United*

*States*, 783 F. Supp. 2d 1230, 1235–36 (CIT 2011), *aff'd* 469 F. App'x 901 (Fed. Cir.

---

[33] Section 1677b defines the cost of production as an amount equal to
> (A) the cost of materials and of fabrication or other processing of any kind
> employed in producing the foreign like product, during a period which
> would ordinarily permit the production of that foreign like product in the
> ordinary course of business;
> (B) an amount for selling, general, and administrative expenses based on
> actual data pertaining to production and sales of the foreign like product
> by the exporter in question; and
> (C) the cost of all containers and coverings of whatever nature, and all
> other expenses incidental to placing the foreign like product in condition
> packed ready for shipment.

19 U.S.C. § 1677b(b)(3).

2012); *see also* I&D Mem. at 13-14.  The significance of any cost changes must be

demonstrated before Commerce analyzes the linkage between costs and sales.  I&D

Mem. at 13.  A significant cost change "is defined as a greater than 25 percent change

in [cost of manufacturing] between the high and low quarters during the POI . . . ."  *Id.* at

14.[34]

### 2.  Parties' Contentions

Çolakoğlu contends that Commerce's 25 percent threshold for relying on

quarterly cost-averages is "overly rigid" and fails to capture significant cost changes

arising through currency fluctuations.  Çolakoğlu Mem. at 26.  According to Çolakoğlu,

Commerce should have conducted its analysis in U.S. Dollars instead of Turkish Lira—

thereby accounting for "devaluations of the Turkish Lira in relation to the U.S. [Dollar]"—

because it purchased "[a]lmost all major inputs" in U.S. Dollars before converting the

costs to Lira in its accounting system.  Çolakoğlu Mem. at 27, 31-32; *see also* Çolakoğlu

Reply at 18 ("[R]egardless of the currency in which Çolakoğlu keeps its books, the costs

of its material input purchases are incurred in USD.").  Had Commerce done so, "the 25

percent threshold test would have been met and would have triggered the use of

Commerce's alternative cost methodology."  Çolakoğlu Mem. at 26, 32.

The Government contends that Commerce correctly applied its usual

methodology by conducting its cost change analysis in Turkish Lira because that is the

---

[34] Commerce conducts this analysis "on a CONNUM-specific basis."  Gov. Resp. at 25;
*see also* I&D Mem. at 14.  A "CONNUM" is a control number assigned to materially-
identical products to distinguish them from non-identical, i.e., similar, products.  Gov.
Resp. at 25 n.2.

currency in which Çolakoğlu maintains its books and records.  Gov. Resp. at 27.  The

Government further contends that Çolakoğlu's argument that Commerce "should have

converted [its] normal accounting records, which are stated in Turkish Lira, to U.S.

[D]ollars, because it purchased inputs in dollars, . . . is just selective accounting for

Çolakoğlu's desired outcome."  Gov. Resp. at 26.

Defendant-Intervenors contend that Çolakoğlu has "misconstrue[d] the standard

of review."  Def.-Ints. Resp. at 39 ("The [c]ourt must decide whether the administrative

record contains substantial evidence to support [Commerce's] decision.") (internal

quotation marks, alteration, emphasis, and citation omitted).

### 3.  Analysis

Çolakoğlu essentially argues that Commerce's methodology for determining

when to deviate from annual cost-averages and rely on quarterly cost-averages is

unreasonable because it fails to account for currency fluctuations.  *See* Çolakoğlu Mem.

at 31 ("The 25 [percent] threshold is not statutory, and would be improved by

incorporating an exchange rate factor.").  Yet, as Çolakoğlu concedes, Commerce has

broad discretion to develop a suitable methodology for calculating the costs of

production.  *See* Çolakoğlu Mem. at 28 (quoting *SeAH Steel*, 34 CIT at 617, 704 F.

Supp. 2d at 1363 ("Commerce is afforded considerable discretion in formulating its

practices in this regard.")).  Beyond asserting that the 25 percent threshold is "overly

rigid" and identifying an alternative (preferred) outcome had Commerce conducted its

analysis in U.S. Dollars, Çolakoğlu offers no persuasive reason why Commerce's

methodology is unreasonable on its face or as applied in this case.  Commerce rejected

Çolakoğlu's request to convert its accounting records from Turkish Lira to U.S. Dollars

before conducting its analysis because "[t]he analysis of significant cost change should

be performed in the same currency as contained in the cost database, which is Turkish

Lira." I&D Mem. at 15. Commerce further explained that "Çolakoğlu's reported costs

already take into account exchange rate differences because purchases in U.S. dollars

are converted to Turkish Lira in the month of the purchase in the normal course of

business." *Id.* at 15. Commerce's refusal was reasonable and consistent with the

statute that provides for cost calculations on the basis of the exporter's books and

records. *See* 19 U.S.C. § 1677b(f)(1)(A).

Çolakoğlu also fails to explain why conducting the analysis in U.S. Dollars would

not distort Commerce's calculations. Although "[a]lmost all major inputs" are purchased

in U.S. Dollars, some inputs are purchased in Turkish Lira. *See* Çolakoğlu Mem. at 27;

Çolakoğlu's Request for Applying Quarterly Average Cost Data at 3, CJA Tab 17, CR

304, PJA Tab 17, PR 244, ECF No. 69-1. Additionally, the cost of production consists

of "the cost of materials *and* of fabrication or other processing," among other things. 19

U.S.C. § 1677b(b)(3) (emphasis added). Although Çolakoğlu's raw material costs

account for more than 60 percent of the cost of producing hot-rolled steel, Çolakoğlu's

Case Br. (Rev.) at 22, CJA Tab 34, CR 473-45, PJA Tab 34, PR 312-16, ECF No. 69-2,

expenses for the remaining aspects of production (e.g., energy, labor, etc.) are,

presumably, incurred in Turkish Lira. These facts further support Commerce's

determination to conduct its analysis in the currency in which Çolakoğlu keeps it books.

Commerce's finding that Çolakoğlu's cost changes did not exceed the 25 percent

threshold is supported by substantial evidence[35] and will be sustained.

### C. Commerce's Treatment of Excess Heat as a Co-Product Instead of a By-Product

#### 1. Legal Framework

"The antidumping statute does not mention the treatment of by-products, and

Commerce has not filled the statutory gap with a regulation."  *Arch Chemicals, Inc. v.*

*United States*, Slip Op. 11-41, 2011 WL 1449034, at *2 (CIT Apr. 15, 2011) (internal

quotation marks and citation omitted).  However, Commerce's "practice has been to

grant an offset to normal value, for sales of by-products generated during the production

of subject merchandise, if the respondent can demonstrate that the by-product is either

resold or has commercial value and re-enters the respondent's production process."  *Id.*

---

[35] Commerce compared the cost of production for the highest and lowest cost quarters for 10 CONNUMs representing Çolakoğlu's five "most frequently sold home and U.S. market CONNUMs during the POI."  Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Çolakoğlu Metalurgi A.Ş and its Affiliates ("Çolakoğlu Final Cost Calc. Mem.") at 2 & Attach. 1, CJA Tab 40, CR 497, PJA Tab 40, PR 327, ECF No. 69-2.  That analysis shows that none of the 10 CONNUMs "exceeded the 25 [percent] significance threshold."  *Id.* at 2, Attach. 1.

(emphasis omitted).[36]  Commerce considers several factors to determine whether joint

products[37] are co-products or by-products:

> 1) how the company records and allocates costs in the ordinary course of
> business, in accordance with its home country [generally accepted
> accounting principles ("GAAP")]; 2) the significance of each product
> relative to the other joint products; 3) whether the product is an
> unavoidable consequence of producing another product; 4) whether
> management intentionally controls production of the product; and, 5)
> whether the product requires significant further processing after the split-
> off point.

I&D Mem. at 17 (citations omitted).

---

[36] In other words, Commerce generally subtracts the revenue derived from the sale of
by-products from the costs of production, thereby lowering the normal value and,
potentially, lowering the antidumping margin that is derived from the difference between
normal value and CEP.  *See Arch Chemicals*, 2011 WL 1449034, at *2; *Magnesium
Corp. of America v. United States*, 20 CIT 1092, 1106, 938 F. Supp. 885, 899 (1996);
Çolakoğlu Mem. at 32 (distinguishing the consequences of Commerce's treatment of
by-products and co-products).  If, however, a joint product is considered a co-product,
costs are allocated to the sales revenue from the sale of the co-product, which
decreases the offset to normal value.  *See* Çolakoğlu Mem. at 32.

[37] In the Issues and Decision Memorandum, Commerce used the National Association
of Accountants' ("NAA") definition of joint product "as two or more products so related
that one cannot be produced without producing the other(s), each having relatively
substantial value and being produced simultaneously by the same process up to a split-
off point."  I&D Mem. at 16 (citations omitted).  Joint products include "major products,
by-products, and co-products."  *Id.*  "The NAA defines a by-product as a secondary
product recovered in the course of manufacturing a primary product, whose total sales
value is relatively minor in comparison with the sales value of the primary product(s)."
*Id.*  In contrast, "[w]hen two or more major products appear in the same group, they are
called co-products."  *Id.*  "Products of greater importance are termed major products and
products of minor importance are termed by-products."  *Id.*; *see also IPSCO, Inc. v.
United States*, 12 CIT 384, 388, 687 F. Supp. 633, 636 (1988) (noting Commerce's
reliance on "the importance of a product to the overall economic activity of its producer
and the product's value in relationship to the value of the primary product" to distinguish
by-products from co-products).

No one factor is dispositive, and Commerce "consider[s] each factor in light of all of the facts and circumstances surrounding each case." I&D Mem. at 17. Çolakoğlu bears the burden of substantiating its entitlement to a by-product offset. *See* 19 C.F.R. § 351.401(b)(1).

### 2. Parties' Contentions

Çolakoğlu contends that Commerce erroneously found that Çolakoğlu "tracks the production of excess heat and assigns a cost to it." Çolakoğlu Mem. at 34; Çolakoğlu Reply at 19 ("Commerce's factual premise for its conclusion is simply wrong."). Çolakoğlu further contends that its recordation of revenue from the sale of excess heat is consistent with Turkish GAAP, and Commerce's conclusion that the separate recording of revenue supports treatment of the excess heat as a co-product calls into question the relevance of Commerce's joint product distinction to Turkish GAAP. Çolakoğlu Mem. at 34-35. The Government contends that a respondent's recording of costs "is just one factor in Commerce's well-established analysis of whether [a joint product] is a co-product or a by-product," and Commerce's decision is consistent with prior proceedings involving Çolakoğlu. Gov. Resp. at 30-31 (citation omitted); *see also* Def.-Ints. Resp. at 39-40.

### 3. Analysis

Çolakoğlu operates a gas turbine ("GT1"), which generates power for its steel production as well as electricity and excess heat. I&D Mem. at 16. Çolakoğlu's affiliate, Ova Elektrik, A.S. ("OVA"), owns a steam turbine. *Id.* Çolakoğlu sells the excess heat generated by GT1 to OVA for use in its steam turbine. I&D Mem. at 16; *see also*

Verification of the Cost Resp. of Çolakoğlu Metalurgi A.Ş. and its Affiliates at 22,

Çolakoğlu Suppl. CJA Tab 4, CR 464, Çolakoğlu Suppl. PJA Tab 4, PR 293, ECF No.

82 (describing the process by which excess heat is sold to OVA).  Çolakoğlu reported

the "revenues generated from the sale of excess heat to its affiliate OVA as a by-

product offset to the electricity costs used in its steel production."  I&D Mem. at 16

(citations omitted).  Commerce, however, disagreed, finding that Çolakoğlu's excess

heat should instead be treated as a co-product, thereby disallowing a "full revenue

offset to Çolakoğlu's production of electricity."  *Id.* at 16.

Commerce's determination rested on the first and second of the above-listed

factors.  *See id.* at 17-18.[38]  As to the first factor, Commerce found that Çolakoğlu tracks

the production of excess heat, assigns a cost to it, and "records sales of excess heat as

a main income."  I&D Mem. at 17.  However, Commerce did not identify record evidence

---

[38] Commerce found that the facts relevant to the third through fifth factors were not indicative of either treatment.  I&D Mem. at 17-18.  As to the third factor, Commerce found no evidence indicating whether excess heat production is unavoidable.  *Id.* at 17. Çolakoğlu asserts that excess heat production is inevitable,  but it cites no record evidence.  Çolakoğlu Reply at 20.  Commerce concluded that the fourth factor was neutral because there was no record evidence demonstrating that Çolakoğlu's management intentionally controlled the amount of excess heat produced.  I&D Mem. at 18.  Çolakoğlu misconstrues Commerce's finding on this issue.  *See* Çolakoğlu Reply at 20.  Commerce also concluded that the fifth factor was neutral because "both the electricity and the excess heat . . . required minimal to no additional processing . . . after the split-off point."  I&D Mem. at 18.  Çolakoğlu contends that "excess heat requires significant further processing to generate electricity."  Çolakoğlu Reply at 21.  Çolakoğlu acknowledges, however, that excess heat "is not a product but a fuel source for a steam turbine."  *Id.*  Thus, although it may take "significant further processing" to produce electricity from excess heat, the excess heat itself is not further processed before becoming a source of value.  *See* I&D Mem. at 18 (describing the implications of further processing after the split-off point).

to support its finding that Çolakoğlu assigns a cost to excess heat.  *See id.*  Although

Çolakoğlu records the cost of electricity sold to OVA, it does not appear to assign a cost

for excess heat.  *See* Questionnaire Resp. of Çolakoğlu Metalurgi A.Ş and its Affiliates

to Sect. D of the U.S. Dep't of [C]ommerce Antidumping Duty Questionnaire ("Çolakoğlu

§ D QR"), Ex. D-18, Çolakoğlu Suppl. CJA Tab 7, CR 102, 112, 114, Çolakoğlu Suppl.

PJA Tab 7, PR 148-50, 152-53, ECF No. 82; Çolakoğlu Reply at 19-20.  At oral

argument, the Government did not dispute the absence of Çolakoğlu's recording of

costs associated with excess heat,[39] and instead emphasized the treatment of the sale

of excess heat as revenue rather than as an offset to electricity costs.  Oral Arg. at

2:38:45-2:40:43.

The record shows that Çolakoğlu records the sale of excess heat as a separate

line item.  *See* Çolakoğlu's Sales Verification Ex. 3, Çolakoğlu 2nd Suppl. CJA Tab 1,

CR 367-68, Çolakoğlu 2nd Suppl. PJA Tab 1, ECF No. 85 (listing income from OVA as

revenue).[40]  Commerce's interpretation of the evidence—that recording of the sale of

excess heat as revenue rather than an offset supports treatment as a co-product—is

reasonable.  Çolakoğlu simply draws the opposite conclusion from the available

---

[39] To the extent the Issues and Decision Memorandum states otherwise, the
Government concedes that it is incorrect.  Oral Arg. at 2:38:45-2:39:09.
[40] Çolakoğlu asserts that it "books the excess heat as an offset to its electricity costs."
Çolakoğlu Reply at 19 (citing Çolakoğlu § D QR at D-21).  The cited document contains
Çolakoğlu's narrative response, which further references Exhibit D-12 appended to the
questionnaire response for Çolakoğlu's "calculation of the excess heat offset."
Çolakoğlu § D QR at D-21.  Exhibit D-12 is precisely that—Çolakoğlu's own calculation
of the offset for the POI—and is not, in fact, a representation of the manner in which
Çolakoğlu maintains its books and records.  *See* Çolakoğlu § D QR, Ex. D-12.

evidence.  *See* Çolakoğlu Mem. at 34 ("Çolakoğlu does not assign costs to excess heat

and separately records the revenue from excess heat, all of which underscores the fact

[that] excess heat should be treated as a by-product.").  Çolakoğlu asserts that its

treatment of excess heat "is not conditioned on whether excess heat is considered a by-

product or a co-product," and questions the relevance of Commerce's joint product

distinction to the treatment of excess heat under Turkish GAAP.  *Id.* at 35.  Regardless

of Çolakoğlu's reasons for treating the sale of excess heat as revenue, however, the

court must uphold an agency determination that is supported by substantial evidence,

which is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Huaiyin Foreign Trade Corp. (30)*, 322 F.3d at 1374 (citation

omitted).  Çolakoğlu's separate recording of the sale of excess heat is "such relevant

evidence" that reasonably, and adequately, supports Commerce's conclusion that the

first factor favors treatment as a co-product.[41]

As to the second factor, Commerce found that "the value of the excess heat is

significant relative to the value of electricity."  I&D Mem. at 17 (citation omitted).

Çolakoğlu questions the standard by which Commerce measured significance, and

asserts that Commerce "never evaluated the relative value of electricity to excess heat."

Çolakoğlu Reply at 20.  As Çolakoğlu recognizes, however, it does not assign a market

---

[41] That Çolakoğlu does not assign costs to excess heat does not change the outcome.
Even assuming, *arguendo*, that one would expect to find costs associated with a co-
product, the possibility of drawing two inconsistent conclusions from the evidence does
not preclude the agency's finding from being supported by substantial evidence.  *See*
*Matsushita*, 750 F.2d at 933.

value to electricity because it is consumed by Çolakoğlu.  *Id.*  Thus, Commerce examined the value of the excess heat relative to the cost of producing electricity.  Oral Arg. at 2:41:25-2:43:10; *see also* Çolakoğlu § D QR, Ex. D-12.  Although revenue and cost are not equivalent measures, this factor does not require a precise comparison. *See* I&D Mem. at 17 (considering "the significance of each product relative to the other joint product[]," which does not demand an examination of the relative significance each product's *value*).  The value of excess heat is roughly half the amount of the cost of electricity produced by GT1.[42]  A reasonable mind could conclude that the value of the excess heat revenue is sufficiently significant so as to support its treatment as a co-product.  *See Huaiyin Foreign Trade Corp. (30)*, 322 F.3d at 1374.  Although Commerce's explanation could have been clearer, the path of its decision is discernible. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("We will . . . uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (internal quotation marks and citation omitted)).

---

[42] For the POI, Çolakoğlu earned [[          ]] TL (Turkish Lira) in revenue for the  sale of excess heat, and incurred [[          ]] TL in costs to produce electricity at  GT1. Çolakoğlu § D QR, Ex. D-12.

In sum, Commerce's consideration of the five factors, and its reliance on the first and second factors in particular, provides substantial evidence to support Commerce's decision to treat excess heat as a co-product rather than a by-product.  *See* 19 C.F.R. § 351.401(b)(1).[43]   Accordingly, Commerce's decision to treat excess heat as a co-product will be sustained.

### D. Commerce's Calculation of Indirect Selling Expenses

Pursuant to 19 U.S.C. § 1677a(d)(1), Commerce shall reduce a respondent's constructed export price[44] by certain expenses incurred by an affiliated seller in the United States.[45]   The statute and the relevant regulation, 19 C.F.R. § 351.401(g), are

---

[43] Commerce also points to "the [significant] amount of kilowatts of excess heat generated in relation to the electricity generated at Çolakoğlu's GT1."  I&D Mem. at 17 (citation omitted).  The record before the court, however, does not clearly indicate the measure of excess heat.  Rather, the record only shows the amount of electricity produced by OVA's steam turbine *from* Çolakoğlu's excess heat, measured in kilowatts. *See* Çolakoğlu Final Cost Calc. Mem., Attach. 2.  The significance of this value for purposes of the issue under consideration is unclear; however, this lack of clarity is not dispositive because the court finds Commerce's determination as to the second factor adequately supported by its finding with regard to the value of the excess heat.

[44] Sales are made on a CEP basis when the "subject merchandise is first sold . . . in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter." 19 U.S.C. § 1677a(b).

[45] In full, § 1677a(d)(1) instructs Commerce to reduce CEP by the amounts incurred by an affiliate for:
      (A) commissions for selling the subject merchandise in the United States;
      (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
      (C) ) any selling expenses that the seller pays on behalf of the purchaser; and
      (D) ) any selling expenses not deducted under subparagraph (A), (B), or (C).
19 U.S.C. § 1677a(d)(1).

silent as to how Commerce should calculate indirect selling expenses ; thus, Commerce has discretion to fashion a reasonable methodology.  *See, e.g.*, *NSK Ltd. v. United States*, 29 CIT 1, 17, 58 F. Supp. 2d 1276, 1291 (2005), *aff'd,* 162 F. App'x 982 (Fed. Cir. 2006).  "Commerce typically allocates indirect selling expenses based on sales value."  *Micron Tech., Inc. v. United States*, 23 CIT 55, 62, 44 F. Supp. 2d 216, 223 (1999); *see also* Gov. Resp. at 22 ("Commerce generally uses a relative sales value methodology to calculate a respondent's indirect selling expenses.").  Pursuant to this methodology, "Commerce calculates an allocation ratio" by dividing a respondent's total indirect selling expenses (the numerator in this equation) by its total sales value upon which those expenses were incurred (the denominator).  Gov. Resp. at 22; *see also* *U.S. Steel Corp. v. United States*, 34 CIT 252, 257-58, 712 F. Supp. 2d 1330, 1337 (2010) (describing Commerce's relative sales value methodology).  Commerce then applies that ratio to the subject merchandise's gross unit price to allocate the indirect sales expenses to each sale.  Gov. Resp. at 22.

Here, Çolakoğlu's affiliate, Medtrade, Inc. ("Medtrade") assisted Çolakoğlu with all of its sales in the United States and North America, and, thus, all of Çolakoğlu's U.S. sales were on a CEP basis.  I&D Mem. at 8-9.  Accordingly, Commerce calculated Çolakoğlu's indirect selling expense ratio on the basis of Medtrade's POI sales and expenses.  *Id.* at 8-9; *see also* Verification of the U.S. Sales Responses of Çolakoğlu Metalurgi A.S. (Metalurgi), Çolakoğlu Dis Ticaret A.S. (COTAS), and Medtrade Inc. (Medtrade) ("Çolakoğlu CEP Sales Verification Report") at 10-11, CJA Tab 30, CR 463, PJA Tab 30, PR 294, ECF No. 69-1.

Çolakoğlu contends that Commerce should instead have allocated Medtrade's indirect selling expenses over sales by Medtrade *and* COTAS, Çolakoğlu's Turkey-based affiliate responsible for direct sales to North America, because some of Medtrade's expenses pertained to Canadian sales.  Çolakoğlu Mem. at 23-24 & n.5. According to Çolakoğlu, its proposed ratio would more accurately reflect the indirect selling expenses incurred on U.S. sales.  *Id.* at 24.  Defendant responds that Commerce correctly declined to include COTAS sales in the indirect selling expense denominator because "it would have created a falsely low ratio by including COTAS sales but not COTAS expenses," which were reported elsewhere.[46]  Gov. Resp. at 23; *see also* Def.-Ints.' Resp. at 39-40.

Commerce calculated an indirect selling expense ratio based upon Medtrade's POI sales and expenses encompassing all of North America.  *See* Çolakoğlu CEP Sales Verification Report at 10-11.  The geographic consistency reflected in the numerator and denominator thus produced a ratio that, when applied to unit price, reasonably allocated the indirect selling expenses to each sale.  Including COTAS's sales in the denominator while excluding its expenses from the numerator would, as the Government contends, artificially lower the ratio.  Accordingly, Çolakoğlu has not

---

[46] COTAS expenses were reported in a separate field capturing "indirect selling expenses incurred in the country of manufacture."  Çolakoğlu CEP Sales Verification Report at 10.

demonstrated that Commerce's allocation of indirect selling expenses in this case is

unreasonable or unsupported by substantial evidence and it will be sustained. [47]

### E. Commerce's Rejection of Corrections to Çolakoğlu's International Ocean Freight Expenses

Çolakoğlu challenges Commerce's refusal to accept at verification certain "minor

corrections" to its reported international freight expenses that consisted of "small

discounts on international freight charges." Çolakoğlu Mem. at 36. Commerce rejected

the corrections on the basis that they "were not minor" because they "affected most of

Çolakoğlu's U.S. sales." I&D Mem. at 10 & n.32 (citing Verification of the Sales

Response of Çolakoğlu Metalurji A.S. (Metalurji), Çolakoğlu Dis Ticaret A.S. (COTAS),

and Medtrade Inc. (Medtrade) ("Çolakoğlu Sales Verification Report") at 2, Çolakoğlu

Suppl. CJA Tab 2, CR 462, Çolakoğlu Suppl. PJA Tab 2, PR 292, ECF No. 82).

Commerce therefore calculated Çolakoğlu's ocean freight on the basis of its

questionnaire response. *Id.* at 10 & n.29 (citations omitted). The Government contends

that that Commerce's refusal to accept corrections to Çolakoğlu's reported international

freight expenses was supported by substantial evidence. Gov. Resp. at 31; *see also*

Def.-Ints. Resp. at 40. The Government is incorrect.

---

[47] Çolakoğlu alternatively contends that Commerce should reset indirect selling expenses for U.S. sales by COTAS to "zero" in order to "offset the distortive effect of not including Çolakoğlu's direct U.S. sales in the [indirect selling expense] ratio denominator." Çolakoğlu Mem. at 24 & nn.6-7. Because the court has not found any distortion in Commerce's indirect selling expense ratio, it need not address Çolakoğlu's proposed remedy.

The Sales Verification Report relied on by Commerce to support its rejection of

Çolakoğlu's corrections fails to substantiate the nature of the corrections.  *See*

Çolakoğlu Sales Verification Report at 2.  Rather, like the Issues and Decision

Memorandum, the Sales Verification Report merely reiterates Commerce's basis for

rejecting the corrections.  *See id.*  At oral argument, the Government explained that

Commerce's verifiers refused to accept the relevant document, so all the record

contains is Commerce's explanation for the refusal.  Oral Arg. at 2:16:00-2:16:28.

Although Commerce has "discretion to reject substantial new factual information

submitted after the deadline for submission of such information," *Reiner Brach GmbH &*

*Co.KG v. United States*, 26 CIT 549, 560, 206 F. Supp. 2d 1323, 1334 (2002), the court

must have some basis upon which to review Commerce's decision that the corrections

"were not minor."[48]  The court cannot accept Commerce's bare conclusion because it is

not supported by substantial evidence.  19 U.S.C. § 1516a(b)(1)(B)(i).[49]  Commerce's

determination will be remanded for reconsideration.

---

[48] The purpose of verification is "to verify the accuracy and completeness of submitted factual information." *Jinko Solar Co., Ltd. v. United States*, 41 CIT____,____, 229 F. Supp. 3d 1333, 1356 (2017) (quoting 19 C.F.R. § 351.307(d)).  Commerce therefore accepts new information at verification "only when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record."  *Id.* (citation omitted);

[49] According to the Government, because Çolakoğlu does not dispute the factual basis underlying Commerce's decision (i.e., that the corrections affected most of Çolakoğlu's U.S. sales), and only challenges the conclusion Commerce drew from that factual basis, the document's absence from the record is not dispositive.  Oral Arg. at 2:17:22-2:18:03.  The court disagrees.  Even assuming, *arguendo*, that the corrections affected the majority of Çolakoğlu's U.S. sales, it does not necessarily follow that the corrections were—or were not—minor.  That determination is inherently fact-specific and raises

### CONCLUSION & ORDER

In accordance with the foregoing, Plaintiffs' respective motions for judgment on the agency record are granted, in part, and denied, in part, and it is hereby

**ORDERED** that Commerce's *Final Determination* is remanded for reconsideration or further explanation of Commerce's treatment of Erdemir's date of sale for home market sales as discussed in Section I.B; it is further

**ORDERED** that Commerce's *Final Determination* is remanded for reconsideration of Çolakoğlu's request for a duty drawback adjustment as discussed in Section II.A; it is further

**ORDERED** that Commerce's *Final Determination* is remanded for reconsideration or further explanation of the agency's rejection of Çolakoğlu's corrections to international ocean freight expenses, as discussed in Section II.E; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before June 20, 2018; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words; it is further

---

questions, for example, about the precise nature of the discount and whether its acceptance would have required a single recalculation of the freight applicable to each sale or transaction-specific recalculations.  Because the court is unable to address those questions, Commerce's decision must be remanded.

**ORDERED** that Commerce's *Final Determination* is sustained with respect to

Erdemir's date of sale for U.S. sales, as discussed in Section I.C; and it is further

**ORDERED** that Commerce's *Final Determination* is sustained with respect to

Commerce's denial of a quarterly cost-averaging methodology for calculating

Çolakoğlu's costs of production, Commerce's treatment of excess heat as a by-product,

and Commerce's calculation of Çolakoğlu's indirect selling expenses, as discussed in

Sections II.B-D.


                                            /s/      Mark A. Barnett
                                            Mark A. Barnett, Judge


Dated:  March 22, 2018
           New York, New York