Slip Op. 18-180

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| EREĞLI DEMIR VE ÇELIK FABRIKALARI T.A.Ş, | |
| Plaintiff, | |
| and | |
| ÇOLAKOĞLU METALURJI A.S. AND ÇOLAKOĞLU DIS TICARET A.S, | |
| Consolidated Plaintiffs, | Before: Mark A. Barnett, Judge<br>Consol. Court No. 16-00218 |
| v. | **PUBLIC VERSION** |
| UNITED STATES, | |
| Defendant, | |
| and | |
| STEEL DYNAMICS, INC., ET AL., | |
| Defendant-Intervenors. | |

## <u>OPINION AND ORDER</u>

[The U.S. Department of Commerce's Remand Redetermination is remanded with respect to the agency's duty drawback adjustment calculation methodology and sustained with respect to the agency's rejection of international freight corrections.]

Dated: December 27, 2018

<u>Matthew M. Nolan</u> and <u>Diana D. Quaia</u>, Arent Fox, LLP, of Washington, DC, for Consolidated Plaintiffs Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S.

<u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, and <u>Jeanne E. Davidson</u>, Director.  Of counsel on the brief was <u>Brandon J. Custard</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Paul C. Rosenthal, R. Alan Luberda, David C. Smith, and Joshua R. Morey, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenor ArcelorMittal USA LLC.

Stephen A. Jones and Daniel L. Schneiderman, King & Spalding, LLP, of Washington, DC, for Defendant-Intervenor AK Steel Corporation.

Alan H. Price and Christopher B. Weld, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Corporation.

Roger B. Schagrin and Christopher T. Cloutier, Schagrin Associates, of Washington, DC, for Defendant-Intervenors Steel Dynamics, Inc. and SSAB Enterprises LLC.

Thomas M. Beline and Sarah E. Shulman, Cassidy Levy Kent (USA) LLP, of Washington, DC, for Defendant-Intervenor United States Steel Corporation.

Barnett, Judge:  This matter is before the court following the U.S. Department of Commerce's ("Commerce" or the "agency") redetermination upon court-ordered remand.  *See* Confidential Final Results of Redetermination Pursuant to Remand ("Remand Redetermination"), ECF No. 105.

Plaintiff Ereğli Demir ve Çelik Fabrikalari T.A.Ş. ("Erdemir") and Consolidated Plaintiffs Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. (together, "Çolakoğlu") each challenged certain aspects of Commerce's final determination in the sales at less than fair value investigation of certain hot-rolled steel flat products from the Republic of Turkey.  *See Certain Hot-Rolled Steel Flat Products from the Republic of Turkey*, 81 Fed. Reg. 53,428 (Dep't Commerce Aug. 12, 2016) (final determination of sales at less than fair value; 2014-2015) ("*Final Determination*"), ECF No. 41-1, and accompanying Issues and Decision Mem., A-489-826 (Aug. 4, 2016), ECF No. 41-3, as amended by *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom*, 81 Fed. Reg.

67,962 (Dep't Commerce Oct. 3, 2016) (am. final affirmative antidumping

determinations for Australia, the Republic of Korea, and the Republic of Turkey and

antidumping duty orders), ECF No. 41-2;[1] Summons, ECF No. 1 (Erdemir); Summons,

ECF No. 1, Court No. 16-00232 (Çolakoğlu); Order (Jan. 1, 2017), ECF No. 45

(consolidating Court Nos. 16-00218 and 16-00232 under lead Court No. 16-00218).[2]

Erdemir challenged Commerce's determinations regarding its home market and U.S.

dates of sale.  *See* Pl.'s Mem. in Supp. of Mot. of Pl. Ereğli Demir ve Çelik Fabrikalari

T.A.Ş., for J. Upon the Agency R. Pursuant to Rule 56.2, ECF No. 52-1.  Çolakoğlu

challenged Commerce's determinations regarding duty drawback, indirect selling

expenses, corrections to international ocean freight expenses, cost-averaging

methodology, and treatment of excess heat as a co-product.  *See* Confidential Pls.

Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. Mem. of Law in Supp. of Mot.

for J. on the Agency R. Pursuant to Rule 56.2, ECF No. 53-1.

On March 22, 2018, the court remanded Commerce's *Final Determination* with

respect to Erdemir's home market date of sale; the denial of Çolakoğlu's duty drawback

---

[1] The administrative record filed in connection with the *Final Determination* is divided
into a Public Administrative Record ("PR"), ECF No. 41-4, and a Confidential
Administrative Record ("CR"), ECF No. 41-5.  The administrative record filed in
connection with the Remand Redetermination is likewise divided into a Public Remand
Record ("PRR"), ECF No. 107-2, and a Confidential Remand Record ("CRR"), ECF No.
107-3.  Çolakoğlu filed joint appendices containing record documents filed in Parties'
remand briefs.  *See* Non-Confidential J.A. to Comments and Reply Comments on
Remand ("PRJA"), ECF No. 117; Confidential J.A. to Comments and Reply Comments
on Remand ("CRJA"), ECF No. 116.  The court references the confidential versions of
the relevant record documents and briefs, if applicable, throughout this opinion.
[2] The relevant period of investigation ("POI") is July 1, 2014, to June 30, 2015. *Final
Determination*, 81 Fed. Reg. at 53,428.

adjustment; and the rejection of Çolakoğlu's corrections to its international freight expenses.  *See Eregli Demir ve Celik Fabrikalari T.A.S v. United States* ("*Erdemir*"), 42 CIT ___, 308 F. Supp. 3d 1297 (2018).[3]  The court sustained Commerce's *Final Determination* in all other respects.  *See id.* at 1304.

On July 20, 2018, Commerce filed its Remand Redetermination.  Therein, Commerce revised its date of sale determination for Erdemir's home market sales; granted Çolakoğlu's duty drawback adjustment; and provided additional evidence and explanation supporting its rejection of Çolakoğlu's corrections to international freight expenses.  *See* Remand Redetermination at 1, 5-24.

Çolakoğlu filed comments opposing Commerce's method of calculating its duty drawback adjustment and continued rejection of its freight expense corrections.  *See* Confidential Consol. Pls. Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S.'s Comments on Remand Redetermination ("Çolakoğlu's Comments"), ECF No. 108. Defendant United States ("Defendant" or the "Government") and Defendant-Intervenors filed comments in support of the Remand Results.  *See* Confidential Def.'s Resp. to Comments on Remand Redetermination ("Def.'s Resp."), ECF No. 111; Def.-Ints.' Comments in Supp. of Remand Results ("Def.-Ints.' Resp."), ECF No. 110.[4]

---

[3] *Erdemir* presents background information on this case, familiarity with which is presumed.
[4] Defendant-Intervenors did not oppose Commerce's home market date of sale redetermination favorable to Erdemir.  Accordingly, this opinion addresses issues relevant solely to Çolakoğlu.

For the reasons discussed herein, Commerce's duty drawback adjustment is remanded for further consideration.  Commerce's rejection of Çolakoğlu's corrections to international freight expenses is sustained.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[5] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  *SolarWorld Ams., Inc. v. United States*, 41 CIT ___, ___, 273 F. Supp. 3d 1314, 1317 (2017) (quoting *Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, 38 CIT ___, ___, 968 F. Supp. 2d 1255, 1259 (2014) (internal quotation marks omitted).

DISCUSSION

**I.  Duty Drawback**

**A.  Legal Framework**

To determine whether the subject merchandise is being sold at less than fair value, Commerce compares the export price ("EP") or constructed export price ("CEP")[6]

---

[5] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all references to the U.S. Code are to the 2012 edition, unless otherwise stated.

[6] U.S. price may consist of an export price or a constructed export price.  Because the distinctions between export price and constructed export price are not at issue in this

of the subject merchandise to its normal value ("NV").  *See generally* 19 U.S.C. § 1673

*et seq.*  Generally, an antidumping duty is the amount by which the normal value of a

product—generally, its price in the exporting country—exceeds export price, as

adjusted.  *See id*. § 1673.  One of the adjustments Commerce makes to export price

pursuant to 19 U.S.C. § 1677a(c) is known as the "duty drawback adjustment."

Specifically, Commerce will increase export price by "the amount of any import duties

imposed by the country of exportation which have been rebated, or which have not

been collected, by reason of the exportation of the subject merchandise to the United

States."  *Id.* § 1677a(c)(1)(B).

This statutory duty drawback adjustment is intended to prevent the dumping

margin from being distorted by import taxes that are imposed on raw materials used to

produce subject merchandise, but which are rebated or exempted from payment when

the subject merchandise is exported to the United States.  *See Saha Thai Steel Pipe*

*(Public) Co. Ltd. v. United States*, 635 F.3d 1335, 1338 (Fed. Cir. 2011); *Wheatland*

*Tube Co. v. United States*, 30 CIT 42, 60, 414 F. Supp. 2d 1271, 1286 (2006), *rev'd on*

*other grounds*, 495 F.3d 1355 (Fed. Cir. 2007).  The adjustment accounts for the fact

that producers are subject to the import duty when merchandise is sold in the home

market, "which increases home market sales prices and thereby increases [normal

value]."  *Saha Thai*, 635 F.3d at 1338.  The statute increases constructed export price

---

case, the court will refer only to export price.  Such references, however, may be
understood as including constructed export price.

"to the level it likely would be absent the duty drawback" to prevent the absence of

import duties from generating or increasing any dumping margin.  *Id.*

Commerce has developed a two-prong test to determine whether a respondent is

entitled to a duty drawback adjustment: "first, . . . that the exemption from import duties

is linked to the exportation of subject merchandise; and second, that there were

sufficient import duties incurred on the imported raw material to account for the amount

of duty drawback received upon the exports of the subject merchandise."  Remand

Redetermination at 6; *see also Saha Thai*, 635 F.3d at 1340 (affirming the lawfulness of

Commerce's two-prong test).

On remand, Commerce determined that Çolakoğlu had demonstrated its

entitlement to the duty drawback adjustment.  Remand Redetermination at 10-11.[7]  At

issue, however, is Commerce's method of calculating the adjustment.

## B. Commerce's Calculation Methodology

Until recently, Commerce calculated the duty drawback adjustment to U.S. price

(referred to as the sales-side adjustment) by dividing rebated or exempted duties by

total exports and adding the resultant per unit duty burden to EP/CEP.  *See Rebar*

*Trade Action Coalition v. United States* ("*RTAC I*"), Slip Op. 15-130, 2015 WL 7573326,

at \*4 (CIT Nov. 23, 2015) (granting Commerce's request for a voluntary remand to

---

[7] Pursuant to Turkish law, Çolakoğlu may be exempted from the payment of import duties (or receive a refund of duties paid) on certain inputs used in the production of (exported) subject merchandise.  *See* Questionnaire Resp. of Çolakoğlu to Suppl. Sec. D of the U.S. Dep't of Commerce Antidumping Duty Questionnaire (Feb. 8, 2016), Ex. SD-32, CR 248-67, PR 218-20, CRJA Tab 4, PRJA Tab 4.

reconsider the sales-side adjustment methodology as set forth in the Issues and

Decision Mem. for the Final Negative Determination in the Less than Fair Value

Investigation of Steel Concrete Reinforcing Bar from Turkey, A-489-818 (Sept. 8, 2014)

("Rebar from Turkey Mem.")).

When producers participate in a duty exemption program, Commerce also makes

a corresponding upward adjustment to the cost of production ("COP") and constructed

value ("CV") (referred to as the cost-side adjustment)[8] to account for the cost of the

unpaid import duties for which the producer remains liable until the merchandise

containing the dutiable input(s) is exported and the exemption program requirements

are satisfied.  *See Saha Thai*, 635 F.3d at 1341-44.  In affirming Commerce's inclusion

of implied duty costs in its calculations, the *Saha Thai* court reasoned that the purpose

of the statutory increase to EP/CEP "is to account for the fact that the import duty costs

are reflected in . . . home market sales prices[] but not . . . sales prices in the United

States[]."  *Id.* at 1342.  Thus, "[i]t would be illogical to increase EP to account for import

duties that are purportedly reflected in NV, while simultaneously calculating NV based

on a COP and CV that do not reflect those import duties."  *Id.*  Accordingly, "[u]nder the

---

[8] Commerce calculates normal value using sales in the home market that are at or
above the cost of production.  19 U.S.C. § 1677b(b)(1).  When there are no such sales,
Commerce calculates normal value "based on the constructed value of the
merchandise."  *Id.*  The cost of production includes "the cost of materials and of
fabrication or other processing" used in manufacturing; "selling, general, and
administrative expenses"; and the cost of packaging.  *Id.* § 1677b(b)(3).  Constructed
value includes similar expenses and an amount for profit.  *Id.* § 1677b(e).

'matching principle,' EP, COP, and CV should be increased together, or not at all."[9]  *Id.*
at 1342-43.[10]

In 2016, on remand pursuant to *RTAC I*, Commerce modified its sales-side
adjustment by allocating exempted duties over total production instead of exports.  *See*
*Rebar Trade Action Coalition v. United States* ("*RTAC II*"), Slip Op. 16-88, 2016 WL
5122639, at *3 (CIT Sept. 21, 2016); Final Results of Redetermination Pursuant to
Court Remand, A-489-818 (Apr. 7, 2016), *available at* http://ia.ita.doc.gov/remands/15-
130.pdf (last visited Dec. 19, 2018) ("Rebar from Turkey Remand Mem.").  Commerce
developed this methodology in response to arguments by domestic producers regarding
distortions in the margin calculations that may arise when the respondent uses fungible
inputs both from foreign sources, which incur import duties, and domestic sources,
which do not.  *See RTAC II*, 2016 WL 5122639, at *3-4.  Commerce claimed that
adhering to its prior methodology generated "distortions" in the margin calculations
because the larger denominator on the cost-side resulted in a smaller adjustment to
normal value than U.S. price.  *Id.* at *3 (citing Rebar from Turkey Remand Mem. at 16).
Thus, according to Commerce, equalizing the denominators used in each adjustment
"ensure[d] that the amount added to both sides of the comparison of EP or CEP with NV
is equitable, *i.e.*, duty neutral[,] meeting the purpose of the adjustment as expressed
in *Saha Thai*."  *Id.* at *4 (citing Rebar from Turkey Remand Mem. at 18).

_____

[9] The "matching principle" is "the basic accounting practice whereby expenses are
matched with benefits derived from them."  *Saha Thai*, 635 F.3d at 1342 (citation
omitted).

[10] Çolakoğlu does not challenge Commerce's application of the cost-side adjustment.

In subsequent administrative proceedings involving respondents that source inputs from foreign and domestic suppliers, including Çolakoğlu here, Commerce has applied its modified sales-side adjustment.  *See* Remand Redetermination at 12, 20-23; *cf.* Issues and Decision Mem. for the Final Determination of the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from India, A-533-863 (May 24, 2016) at 7-11, *available at* https://enforcement.trade.gov/frn/summary/india/2016-12986-1.pdf (last visited Dec. 19, 2018); Issues and Decision Mem. for the Final Results of Antidumping Duty Admin. Review: Welded Carbon Steel Standard Pipe and Tube Products from Turkey; 2014-2015, A-489-501 (Dec. 12, 2016) at 5-6, *available at* https://enforcement.trade.gov/frn/summary/turkey/2016-30541-1.pdf (last visited Dec. 19, 2018).  In the underlying proceeding, Commerce divided Çolakoğlu's exempted duties by the POI total cost of manufacturing subject hot-rolled steel products to derive a drawback ratio.  Remand Redetermination at 21; Am. Final Calculation Mem. for Çolakoğlu (June 28, 2018) ("Çolakoğlu Calc. Mem.") at 3, CRR 11, PRR 6, CRJA Tab 20, PRJA Tab 20.  Commerce applied that ratio to the CONNUM-specific cost of manufacturing "to calculate the amount of imputed import duties" to be added to Çolakoğlu's cost of production.  Remand Redetermination at 21; Çolakoğlu Calc. Mem. at 3.[11]  Commerce subsequently capped Çolakoğlu's upward adjustment to export price "by the amount of the import duties included in the [cost of production]."  Remand

---

[11] "A 'CONNUM' is a control number assigned to materially-identical products to distinguish them from non-identical, i.e., similar, products."  *Erdemir*, 308 F. Supp. 3d at 1321 n.34 (citation omitted).

Redetermination at 21; Çolakoğlu Calc. Mem. at 3-4.  In so doing, Commerce reiterated the need for an "equitable, i.e., duty neutral" comparison of export price with normal value to maintain consistency "with the purpose of the adjustments as affirmed in *Saha Thai*."  Remand Redetermination at 12 & n.56 (citing *Saha Thai*, 635 F.3d at 1344).[12]

In response to Çolakoğlu's argument that 19 U.S.C. § 1677a(c)(1)(B) requires Commerce to allocate exempted duties over total exports regardless of the source of the inputs, Commerce noted the statute's lack of an explicit allocation methodology and its corresponding discretion in that regard.  *Id.* at 21-22.  Commerce further noted that, pursuant to its "normal costing methodology, the cost to produce a given product is [] the same, regardless of whether the product is sold domestically or is exported."  *Id.* at 22.

## C.  Parties' Contentions

Çolakoğlu contends that Commerce's modified sales-side adjustment is unlawful because it attributes some of the adjustment to home market sales, in contravention of the statutory linkage between the adjustment and exported merchandise, and lessens the full upward adjustment to which it is entitled.  Çolakoğlu's Comments at 4-6, 10.  Çolakoğlu further contends that Commerce's reliance on *Saha Thai* to support the

---

[12] Commerce asserted that it granted the duty drawback adjustment "consistent with [its] practice."  Remand Redetermination at 11 & n.54 (citing Rebar from Turkey Mem. at Comment 1, accompanying *Steel Concrete Reinforcing Bar from Turkey*, 79 Fed. Reg. 54,965 (Dep't Commerce Sept. 15, 2014) (final neg. determination of sales at less than fair value and final determination of critical circumstances)).  As noted, however, Commerce applied its original sales-side adjustment in that determination.  *See RTAC I*, 2015 WL 7573326, at *4.

modified sales-side adjustment as ensuring a "duty neutral" approach is misplaced.  *Id.*

at 8-9.

The Government contends that Commerce's calculation of the duty drawback

adjustment represents a permissible construction of the statute, which is silent on the

issue of allocation.  Def.'s Resp. at 9-10, 12.  According to the Government, "[h]ad

Congress intended to limit Commerce's discretion in performing the EP/CEP duty

drawback calculation, . . . the statute would provide that for each unit of subject

merchandise exported, the EP/CEP shall be increased by the amount of duty rebated or

not collected on that unit."  *Id.* at 10.  While recognizing that *Saha Thai* "does not

address allocation," the Government contends that the U.S. Court of Appeals for the

Federal Circuit ("Federal Circuit") "endorsed the concept of a 'matching principle,' which

would ensure [duty] neutrality by requiring equal adjustments to both the NV and

EP/CEP sides of the equation."  *Id.* at 11 (citing *Saha Thai*, 635 F.3d at 1342-43).  The

Government further contends that "Çolakoğlu ignores the distortions" to the margin

calculations that occur "when respondents use a mix of foreign and domestic [inputs]."

*Id.* at 13; *see also id.* at 9 ("Çolakoğlu suggests that it is statutorily entitled to a distorted

margin calculation.").

Defendant-Intervenors likewise contend that the statute is silent as to how

Commerce should calculate the adjustment and contend that examination of the

statue's purpose and context confirms that the agency's interpretation is reasonable.

Def.-Int.'s Resp. at 6.  Defendant-Intervenors further contend that "granting a full

upward adjustment to EP/CEP . . . would result in an inequitable comparison [with] normal value." *Id.* at 7.[13]

### D. Commerce's Methodology is Remanded

Commerce relies on the purported statutory silence regarding the way it must calculate the duty drawback adjustment to support its discretionary decision to allocate exempted duties over total production. *See* Remand Redetermination at 21; *cf.* Def.'s Resp. at 9-10, 12; Def.-Int.'s Resp. at 6. The court's review of Commerce's interpretation and implementation of a statutory scheme is guided by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1322, 1329 (Fed. Cir. 2017). First, the court must determine "whether Congress has directly spoken to the precise question at issue." *Id.* (quoting *Chevron*, 467 U.S. at 842). If Congress's intent is clear, "that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress." *Id.* (quoting *Chevron*, 467 U.S. at 842–43). Only "if the statute is silent or ambiguous," must the court determine whether the agency's action "is based on a permissible construction of the statute." *Id.* (quoting *Chevron*, 467 U.S. at 843).

---

[13] Defendant-Intervenors also support their argument by way of reference to certain aspects of the Turkish duty drawback regime. *See* Def.-Int.'s Resp. at 6-7. Commerce, however, did not discuss or rely on these provisions to support its determination. Accordingly, the court does not address them. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) (barring the court from accepting "*post hoc* rationalizations for agency action," and noting that it may only sustain the agency's decision "on the same basis articulated in the order by the agency itself").

The court has thrice rejected Commerce's allocation of foregone duties over total production as inconsistent with the statutory linkage between those duties and exported merchandise. *See Tosçelik Profil ve Sac Endüstrisi A.Ş. v. United States*, 42 CIT ___, ___, 321 F. Supp. 3d 1270, 1275-78 (2018) (Commerce's adjustment "fails to adequately connect the adjustment to duties forgiven 'by reason of' the products' exportation to the United States"); *Uttam Galva Steels Limited v. United States*, 42 CIT ___, ___, 311 F. Supp. 3d 1345, 1355 (2018) (same); *RTAC II*, 2016 WL 5122639 at *4 (the duty drawback adjustment, "being causally related to exportation, not production, is allocable only to the exports to which it relates"). The court agrees that Commerce's modified sales-side adjustment contravenes the plain language of the statute.[14]

As noted, section 1677a(c)(1)(B) requires Commerce to increase "export price and constructed export price" by "*the amount* of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, *by reason of the exportation* of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B) (emphasis added). Congress, thus, clearly intended the adjustment to capture the amount of duties Çolakoğlu would have paid on its export sales but for the exportation of that merchandise. Allocating Çolakoğlu's exempted duties over total production "contravenes the plain language of 19 U.S.C. § 1677a(c)(1)(B)" because it attributes some of the drawback to domestic sales, which do not earn drawback, and

---

[14] While these opinions are not binding on this court, *see Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989), the court may nevertheless consult the reasoning contained therein to the extent that it is persuasive.

fails to adjust export price by the amount of the import duties exempted by reason of exportation. *See Tosçelik*, 321 F. Supp. 3d at 1278. In other words, instead of calculating the amount of the adjustment on the basis of duties foregone solely in relation to the exported merchandise eligible for drawback, as the statute requires, Commerce has calculated an amount that is based on the distribution of some of the exempted duties to domestic sales, which is contrary to the statute's plain language.

Even if the statute was ambiguous, as Commerce contends, by lacking a more explicit methodology, Commerce must "exercise [] its gap-filling authority" in a "reasonable" manner. *See Apex Frozen Foods*, 862 F.3d at 1330 (citing *Chevron*, 467 U.S. at 843–44). Commerce's exercise of any discretionary authority it has in this regard was unreasonable because it substantively departed from the guidance Congress *did* provide by decoupling the amount of the adjustment from duties forgiven solely on exported merchandise. *See Ningbo Dafa Chem. Fiber Co., Ltd. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009) (an agency's statutory interpretation is unreasonable when it is "manifestly contrary" to the statutory terms) (citation omitted).[15]

---

[15] While Commerce regularly uses the term "distortion" to describe the margin effect of using only exports as the denominator, Commerce's assertion is unaccompanied by any analysis to demonstrate the alleged distortion. The court might infer that the use of the term implies an assumption that the cost of the domestically-sourced input approximates the import duty-*exclusive* cost of the foreign-sourced input. Commerce has not, however, provided any support for this assumption. It stands to reason, moreover, that a domestic supplier of a particular input that incurs duties when imported from a foreign supplier would price its product at a level competitive with the duty-*inclusive* cost of the imported input. In such a scenario, it is difficult to understand the margin effect of a proper duty drawback adjustment as distortive.

Commerce's—and, by extension, the Government's—reliance on *Saha Thai* is also misplaced.  *See* Remand Redetermination at 12; Def.'s Resp. at 11.  In *Saha Thai*, the Federal Circuit approved Commerce's decision to utilize the cost-side adjustment in conjunction with its original sales-side adjustment to ensure that normal value and U.S. price are compared on a mutually-duty-inclusive basis.  *See* 635 F.3d at 1342 (finding that Commerce "reasonably decided" to accompany an increase to EP with a "corresponding increase to COP and CV" because "[i]t would be illogical to increase EP to account for import duties that are purportedly reflected in NV, while simultaneously calculating NV based on a COP and CV that do not reflect those import duties"); *see also id.* at 1342-43 ("Under the 'matching principle,' EP, COP, and CV should be increased together, or not at all.").  The Federal Circuit never stated or otherwise inferred that the adjustments to EP/CEP and normal value must be "equal," Def.'s Resp. at 11, in order to render the comparison between U.S. price and normal value "duty neutral," Remand Redetermination at 12.  Commerce's interpretation of the Federal Circuit's discussion of duty inclusivity to espouse such a position, which would neutralize the duty drawback adjustment, goes further than the opinion supports and is inconsistent with the purpose of the statute.  Accordingly, this issue is remanded to the agency to revise its calculation of the duty drawback adjustment using exports as the denominator rather than total production.[16]

---

[16] Çolakoğlu urges the court to constrain Commerce on remand from implementing a methodology utilized in the remand redetermination pursuant to *Uttam Galva*, 311 F. Supp. 3d at 1355.  *See* Çolakoğlu's Comments at 10-12 & Attach. 1.  Defendant and Defendant-Intervenors oppose the request.  *See* Def.'s Resp. at 14-15; Def.-Int.'s Resp.

## II. Corrections to International Freight Expenses

### A. Commerce's Redetermination

On remand, Commerce reopened the record and requested additional

information from Çolakoğlu in order to re-evaluate whether its corrections constituted

"minor corrections to its reported international freight expenses." *Id.* at 13 & n.63

(citation omitted).  Çolakoğlu responded that although it had initially "reported the gross

amount of the international freight charges, . . . in preparation for verification, [it] . . .

noted that certain international freight invoices had been discounted." *Id.* at 14 & n.64

(citing Çolakoğlu's Resp. to Dep't's Suppl. Questionnaire (June 1, 2018) ("Çolakoğlu's

Suppl. QR"), CRR 1-9, PRR 4, CRJA Tab 18, PRJA Tab 18).  Çolakoğlu identified the

number of international freight invoices containing discounts and the corresponding

decrease in freight expenses, the number of affected U.S. sales, and the volume of

affected subject merchandise.  *Id.* at 14.[17]

---

at 8-9.  Çolakoğlu's request is premature in that it seeks the court's opinion on a
methodology that Commerce might not apply on remand and without the benefit of
Commerce's reasoning to justify, if possible, such an adjustment.  Such an opinion
would, moreover, amount to an impermissible advisory opinion because the court would
be opining on matters outside the scope of the instant case and controversy.  *See
United States v. Fruehauf*, 365 U.S. 146, 157 (1961); *Verson, A Div. of Allied Prods.
Corp. v. United States*, 22 CIT 151, 153-54, 5 F. Supp. 2d 963, 966 (1998) ("[A] federal
court does not have the power to render an advisory opinion on a question simply
because [it] may have to face the same question in the future.") (internal quotation
marks and citations omitted).  Accordingly, the court declines Çolakoğlu's request.
[17] Specifically, Çolakoğlu explained that [[  ]] out of [[  ]] international ocean freight
invoices contained discounts that decreased Çolakoğlu's reported expenses from [[
]] U.S. dollars to [[       ]] U.S. dollars, and those discounts affected [[    ]] out of [[    ]]
U.S. sales for the period of investigation, which corresponded to [[     ]] out of [[     ]]
metric tons of subject merchandise.  Remand Redetermination at 14 & nn.65-67 (citing
Çolakoğlu's Suppl. QR at 8-9).

Commerce determined that Çolakoğlu's corrections did not meet the criteria for the type of information the agency accepts at verification, *to wit*, (1) information, the need for which "was not evident previously"; (2) information that "makes minor corrections to information already on the record"; or (3) "information [that] corroborates, supports, or clarifies" existing record information. *Id.* at 14 & n.68 (citation omitted). Commerce based its determination that the corrections were not minor on the number of affected sales, the "amount of new factual information" required to review the corrections, and that implementation of the corrections would require Commerce "to ascertain which of the . . . corrected invoices affected each of the . . . POI sales."[18] *Id.* at 14-15, 24. With regard to the first and third criteria, Commerce explained that "the need for information regarding Çolakoğlu's international freight expenses was apparent when [it] submitted its initial . . . questionnaire response," and the "corrections do not corroborate, support, or clarify" existing information but, rather, should have been included in the initial questionnaire response. *Id.* at 14-15. Commerce stated that it "applied the same standard to each correction presented by Çolakoğlu at verification," regardless of whether the correction would increase or decrease the margin. *Id.* at 24.

### B. Parties' Contentions

Çolakoğlu contends that the international freight corrections were minor because the discounts represented a small percentage of its total freight costs and total U.S.

---

[18] Commerce noted that "more than 50 [percent] of the invoices individually contained mistakes," affecting more than [[  ]] percent of U.S. sales. *Id.* at 14-15. Making those corrections would require Commerce to match each of the [[  ]] corrected invoices to "each of the [[              ]] POI sales." *Id.* at 24.

sales.[19]  Çolakoğlu's Comments at 13.[20]  Defendant contends that incorporating the

corrections would have required Commerce to trace discounts omitted from certain

invoices to the affected sales and, thus, Commerce correctly concluded the corrections

were not minor.  Def.'s Resp. at 15-16.  Defendant-Intervenors contend that Çolakoğlu's

questionnaire responses on remand demonstrate that the corrections were not minor.

Def.-Ints.' Resp. at 10.

### C. Commerce's Redetermination is Sustained

        In determining whether Commerce's decision is supported by substantial

evidence, the court "may not reweigh the evidence or substitute its own judgment for

that of the agency."  *Usinor v. United States,* 28 CIT 1107, 1111, 342 F. Supp. 2d 1267,

1272 (2004).  Although Çolakoğlu seeks to direct the court to the minimal sums

representing the discounts as a percentage of Çolakoğlu's total freight costs and total

U.S. sales, *see supra* note 19, the court's standard of review asks whether the basis for

Commerce's decision—the number of affected sales and the need to trace discounts

contained in particular invoices to those sales—represents substantial evidence that the

corrections were not minor.  "Substantial evidence is 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign*

---

[19] The discounts represented [[   ]] percent of Çolakoğlu's total freight costs and [[    ]]
percent of total U.S. sales value.  Çolakoğlu's Comments at 13 & nn.4-5 (setting forth
the equations resulting in the aforementioned percentages) (citations omitted).
[20] Çolakoğlu also implies that Commerce's refusal to accept the corrections was
unreasonable and arbitrary because the agency accepted corrections that increased
Çolakoğlu's dumping margin yet refused to accept a correction that would reduce the
margin.  *Id.* at 13.  Çolakoğlu fails, however, to point to record evidence supporting this
speculative assertion.

*Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It "requires more than a mere

scintilla," but "less than the weight of the evidence."  *Nucor Corp. v. United States*, 34

CIT 70, 72, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx, Inc. v. United States*, 370

F.3d 1108, 1116 (Fed. Cir. 2004)).  Commerce's determination is supported by

substantial evidence.

 Çolakoğlu reported its international freight expenses "on a transaction specific

basis" for direct U.S. sales and sales made through Medtrade, Inc ("Medtrade").

Çolakoğlu's Suppl. QR at 7.  Several invoices applicable to each type of sale contained

varying discounts.  *See id.*[21]  Making the corrections would have required Commerce to

match each affected transaction to particular invoices and their respective discounts.

*See* Remand Redetermination at 14-15, 24.  The number of affected sales and

variations in the discounts affecting those sales provide substantial evidentiary support

for Commerce's decision that the corrections were not minor.  Accordingly, Commerce's

redetermination on this issue is sustained.

---

[21] [[  ]] invoices pertaining to direct sales and [[  ]] invoices pertaining to
Medtrade sales contained discounts.  Çolakoğlu's Suppl. QR at 8.  For direct sales, the
discounts ranged from [[  ]] U.S. dollars per metric ton.  *Id.*  For Medtrade sales,
the discounts ranged from [[  ]] U.S. dollars per metric ton.  *Id.*

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Remand Redetermination is remanded for reconsideration regarding the agency's calculation of Çolakoğlu's duty drawback adjustment, as set forth in Section I; it is further

**ORDERED** that Commerce's Remand Redetermination is sustained with respect to the agency's rejection of Çolakoğlu's international freight corrections, as set forth in Section II; it is further

**ORDERED** that Commerce shall file its second remand redetermination on or before April 3, 2019; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.


/s/      Mark A. Barnett
Mark A. Barnett, Judge


Dated: December 27, 2018
         New York, New York