Slip Op. 19-135

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| EREĞLI DEMIR VE ÇELIK FABRIKALARI T.A.Ş,<br><br>　　　　　　Plaintiff,<br><br>　　and<br><br>ÇOLAKOĞLU METALURJI A.S. AND ÇOLAKOĞLU DIS TICARET A.S,<br><br>　　　　　　Consolidated Plaintiffs,<br><br>　　v.<br><br>UNITED STATES,<br><br>　　　　　　Defendant,<br><br>　　and<br><br>STEEL DYNAMICS, INC., ET AL.,<br><br>　　　　　　Defendant-Intervenors. | Before: Mark A. Barnett, Judge<br>Consol. Court No. 16-00218 |

## OPINION AND ORDER

[The U.S. Department of Commerce's Final Results of Redetermination Pursuant to Second Court Remand are Remanded.]

Dated: October 29, 2019

<u>Matthew M. Nolan</u>, Arent Fox, LLP, of Washington, DC, for Consolidated Plaintiffs Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S.

<u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were <u>Joseph H. Hunt</u>, Acting Assistant Attorney General, and <u>Jeanne E. Davidson</u>, Director.  Of counsel on the brief was <u>Brandon J. Custard</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Paul C. Rosenthal, R. Alan Luberda, David C. Smith, and Joshua R. Morey, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenor ArcelorMittal USA LLC.

Stephen A. Jones and Daniel L. Schneiderman, King & Spalding, LLP, of Washington, DC, for Defendant-Intervenor AK Steel Corporation.

Alan H. Price and Christopher B. Weld, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Corporation.

Roger B. Schagrin and Christopher T. Cloutier, Schagrin Associates, of Washington, DC, for Defendant-Intervenors Steel Dynamics, Inc. and SSAB Enterprises LLC.

Thomas M. Beline and Sarah E. Shulman, Cassidy Levy Kent (USA) LLP, of Washington, DC, for Defendant-Intervenor United States Steel Corporation.

Barnett, Judge:  This matter is before the court following the U.S. Department of Commerce's ("Commerce" or "the agency") redetermination upon second court-ordered remand.  *See* Final Results of Redetermination Pursuant to Second Court Remand ("2nd Remand Results"), ECF No. 133.  Plaintiff Ereğli Demir ve Çelik Fabrikalari T.A.Ş. ("Erdemir") and Consolidated Plaintiffs Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. (together, "Çolakoğlu") each challenged aspects of Commerce's final determination in the sales at less than fair value investigation of certain hot-rolled steel flat products from the Republic of Turkey.  *See Certain Hot-Rolled Steel Flat Products from the Republic of Turkey*, 81 Fed. Reg. 53,428 (Dep't Commerce Aug. 12, 2016) (final determination of sales at less than fair value; 2014–2015) ("*Final Determination*"), ECF No. 41-1, and accompanying Issues and Decision Mem., A-489-826 (Aug. 4, 2016), ECF No. 41-3, as amended by *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom*, 81 Fed. Reg. 67,962 (Dep't Commerce Oct. 3, 2016) (am. final

aff. antidumping determinations for Australia, the Republic of Korea, and the Republic of Turkey and antidumping duty orders), ECF No. 41-2.[1]  This is the court's third opinion addressing challenges arising out of Commerce's *Final Determination*.

On March 22, 2018, the court remanded the *Final Determination* with respect to Erdemir's home market date of sale; the denial of Çolakoğlu's duty drawback adjustment; and the rejection of Çolakoğlu's corrections to its international freight expenses.  *See Ereğli Demir ve Çelik Fabrikalari T.A.S v. United States* ("*Erdemir I*"), 42 CIT ___, 308 F. Supp. 3d 1297 (2018). The court sustained Commerce's *Final Determination* in all other respects.  *See id.* at 1304.  On remand from *Erdemir I*, Commerce revised its date of sale determination for Erdemir's home market sales in a manner favorable to Erdemir; granted Çolakoğlu's duty drawback adjustment but revised its method of calculating the adjustment; and provided additional evidence and explanation supporting its rejection of Çolakoğlu's corrections to international freight expenses.  *See* Confidential Final Results of Redetermination Pursuant to Remand ("1st Remand Results") at 1, 5–24, ECF No. 105.[2]  In response to Çolakoğlu's challenges to

---

[1] The administrative record filed in connection with the 2nd Remand Results is contained in a Public 2nd Remand Record, ECF No. 134-2, and a Confidential 2nd Remand Record ("2nd CRR"), ECF No. 134-3.  Parties submitted public and confidential joint appendices containing record documents cited in their briefs. *See* Non-Confidential J.A. to 2nd Remand Redetermination, ECF No. 141; Confidential J.A. to 2nd Remand Redetermination ("CRJA"), ECF No. 140.  The court references the confidential version of record documents, unless otherwise specified.

[2] The administrative record filed in connection with the 1st Remand Results is contained in a Public 1st Remand Record, ECF No. 107-2, and a Confidential 1st Remand Record ("1st CRR"), ECF No. 107-3.

Commerce's method of calculating the duty drawback adjustment and continued rejection of its freight expense corrections, on December 27, 2018, the court remanded the former determination and sustained the latter.  *See Ereğli Demir ve Çelik Fabrikalari T.A.Ş v. United States* ("*Erdemir II*"), 42 CIT ___, ___, 357 F. Supp. 3d 1325, 1332–34, 1336 (2018).[3]

On June 3, 2019, Commerce filed its second remand results.  *See* 2nd Remand Results.  Therein, Commerce again revised its method of calculating Çolakoğlu's duty drawback adjustments to U.S. price and made a circumstance of sale ("COS") adjustment to normal value to increase it by the same amount as the duty drawback adjustment.  *Id.* at 2, 6–16, 21–28.  The changes made by Commerce increased Çolakoğlu's weighted-average dumping margin from 5.70 percent to 6.27 percent.  *Id.* at 16.

Çolakoğlu filed comments opposing Commerce's use of a COS adjustment.  *See* Consol. Pls. Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S.'s Comments on Remand Redetermination ("Çolakoğlu's Cmts."), ECF No. 135.  Defendant United States ("the Government") and Defendant-Intervenors filed comments in support of the 2nd Remand Results.  *See* Def.'s Resp. to Comments on Second Remand

---

[3] *Erdemir I* and *Erdemir II* present additional background on this case, familiarity with which is presumed.

Redetermination ("Gov't's Reply Cmts."), ECF No. 138; Def.-Ints.' Comments in Supp.

of 2nd Remand Results ("Def.-Ints.' Reply Cmts."), ECF No. 139.[4]

The court recently remanded Commerce's decision to make a COS adjustment

to normal value in the same amount as the duty drawback adjustment to U.S. price.

*See generally Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi, A.Ş. v. United States*, Slip

Op. 19-130, 2019 WL 5270152 (CIT Oct. 17, 2019).  For the reasons discussed in

*Habaş* and herein, the court sustains Commerce's duty drawback adjustment as applied

to export price and remands Commerce's decision to make a COS adjustment in the

same amount.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[5] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The

results of a redetermination pursuant to court remand are also reviewed for compliance

with the court's remand order."  *SolarWorld Ams., Inc. v. United States*, 41 CIT ___,

___, 273 F. Supp. 3d 1314, 1317 (2017) (citation and internal quotation marks omitted).

---

[4] Defendant-Intervenors consist of ArcelorMittal USA LLC, AK Steel Corporation, Nucor Corporation, Steel Dynamics Inc., SSAB Enterprises LLC, and United States Steel Corporation.  Def.-Ints.' Reply Cmts. at 2.

[5] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all references to the U.S. Code are to the 2012 edition, unless otherwise stated.

## DISCUSSION

**I.   Duty Drawback and Circumstance of Sale Adjustments**

### A.   Commerce's Duty Drawback Calculation Methodologies Prior to *Erdemir II*

To determine whether the subject merchandise is being sold at less than fair value, Commerce compares the export price or constructed export price[6] of the subject merchandise to its normal value.  *See generally* 19 U.S.C. §§ 1673 *et seq*.  Generally, an antidumping duty is the amount by which the normal value of a product—typically, its price in the exporting country—exceeds export price, as adjusted.  *See id*. § 1673.  One of the adjustments Commerce makes to export price pursuant to 19 U.S.C. § 1677a(c) is known as the "duty drawback adjustment."  Specifically, Commerce is to increase export price by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States."  *Id.* § 1677a(c)(1)(B).  This statutory adjustment is intended to prevent the dumping margin from being increased by import taxes that are imposed on inputs used to produce subject merchandise, if those import taxes are rebated or exempted from payment when the subject merchandise is exported to the United States.  *See Saha Thai Steel Pipe (Public) Co. Ltd. v. United States*, 635 F.3d 1335, 1338 (Fed. Cir. 2011); *Wheatland Tube Co. v. United States*, 30

---

[6] U.S. price may be based on export price or constructed export price.  Because the distinctions between export price and constructed export price are not at issue in this case, the court generally will refer only to export price or U.S. price.  Such references, however, may be understood as including constructed export price.

CIT 42, 60, 414 F. Supp. 2d 1271, 1286 (2006), *rev'd on other grounds*, 495 F.3d 1355

(Fed. Cir. 2007).  The adjustment accounts for the fact that imported inputs remain

subject to the import duties when consumed in the production of the foreign like product,

"which increases home market sales prices and thereby increases [normal value]."

*Saha Thai*, 635 F.3d at 1338.

"Until recently, Commerce calculated the duty drawback adjustment to U.S. price

. . . by dividing rebated or exempted duties by total exports and adding the resultant per

unit duty burden to the export price."  *Erdemir II*, 357 F. Supp. 3d at 1330.  When

producers were exempt[7] from the payment of import duties, Commerce also increased

cost of production and constructed value[8] to account for the cost of the exempted duties

for which the producer remained liable until the exemption program requirements were

satisfied.  *Id.*; *see also Saha Thai*, 635 F.3d at 1341–44 (affirming the upward

---

[7] A duty exemption program is different from a duty rebate (or reimbursement) program. For a rebate program, "import duties are paid and later refunded by the government of the exporting country."  2nd Remand Results at 6.  Thus, the duties are usually recorded as a "direct material cost" in the producer's books and a separate revenue is recorded to book the amount of any drawback granted in connection with an export transaction.  *Id.* For an exemption program, an "off-the-books" liability is created upon importation of the input, which is later forgiven when the finished product is exported. *Id.* at 15.  In that case, the producer typically will "neither record an amount for import duties as a direct material cost, nor recognize a separate revenue for the amount of duty drawback granted for the export transaction."  *Id.* at 6–7.

[8] Commerce calculates normal value using sales in the home market or a third country market that are at or above the cost of production.  19 U.S.C. § 1677b(b)(1).  When there are no such sales, Commerce calculates normal value "based on the constructed value of the merchandise."  *Id.*  The cost of production includes "the cost of materials and of fabrication or other processing" used in manufacturing; "selling, general, and administrative expenses"; and the cost of packaging.  *Id.* § 1677b(b)(3).  Constructed value includes similar expenses and an amount for profit.  *Id.* § 1677b(e).

adjustment to cost of production).  In 2016, Commerce modified its duty drawback

adjustment "by allocating exempted duties over total production rather than exports."

*Erdemir II*, 357 F. Supp. 3d at 1330–31.  Commerce adjusted its methodology in

response to assertions that margin distortions arose when foreign producers "use[d]

fungible inputs both from foreign sources, which incur[red] import duties, and domestic

sources, which [did] not."  *Id.* at 1331  Commerce reasoned that "the larger denominator

on the cost-side [i.e., total production] resulted in a smaller adjustment to normal value

than U.S. price"; consequently, it determined that "equalizing the denominators used in

each adjustment" ensured that an equal amount would be added to U.S. price and

normal value and the agency would compare the two values on a "duty neutral" basis.

*Id.* at 1331.

In the administrative proceeding underlying *Erdemir II*, Commerce used this

modified duty drawback methodology to calculate the adjustment to U.S. price and

make a corresponding equal upward adjustment on the cost side pursuant to *Saha*

*Thai*.  *See* 1st Remand Results at 11–12, 20–21.  The court remanded the duty

drawback adjustment to U.S. price—specifically, Commerce's allocation of the

exempted duties over total production—as "inconsistent with the statutory linkage

between [the foregone] duties and exported merchandise."  *Erdemir II*, 357 F. Supp. 3d

at 1333 (collecting cases reaching the same conclusion).  The court reasoned that

"Congress . . . clearly intended the adjustment to capture the amount of duties

Çolakoğlu would have paid on its export sales but for the exportation of that

merchandise"; thus,

> [a]llocating Çolakoğlu's exempted duties over total production
> contravene[d] the plain language of 19 U.S.C. § 1677a(c)(1)(B) because it
> attribute[d] some of the [duty] drawback to domestic sales, which do not
> earn drawback, and fail[ed] to adjust export price by the amount of the
> import duties exempted by reason of exportation.

*Id.* (internal quotation marks and citation omitted).  The court further rejected

Commerce's reliance on *Saha Thai* to support its revised methodology.  *Id.* at 1334.

While the cost-side adjustment approved by the *Saha Thai* court "ensure[s] that normal

value and U.S. price are compared on a mutually-duty-inclusive basis," the appellate

court "never stated or otherwise inferred that the adjustments to [U.S. price] and normal

value must be equal . . . in order to render the comparison between U.S. price and

normal value duty neutral."  *Id.* (internal citations and internal quotation marks omitted).

The court remanded the issue "to the agency to revise its calculation of the duty

drawback adjustment using exports as the denominator rather than total production."

*Id*.

### B.  Commerce's Calculation Methodology on Remand from *Erdemir II*

In accordance with *Erdemir II*, Commerce recalculated the duty drawback

adjustment using exports as the denominator.  2nd Remand Results at 16, 17.  In

addition, however, Commerce made a circumstance of sale adjustment to normal value

to add the same per-unit amount of duty "in order to achieve a fair comparison."  *Id.* at

14; *see also id.* at 16.

Çolakoğlu imported several inputs subject to varying duties and purchased the

same inputs from domestic sources.  *Id.* at 12.  Çolakoğlu participated in a duty

exemption program, and, thus, did not record liability for the import duties in its books

and records.  *Id.* at 12, 15.  According to Commerce, when subject merchandise can be

produced from various inputs, only some of which are dutiable imports, or from inputs

that are procured from foreign and domestic sources, "the presumption that the normal

value includes the full duty proportionate to the full duty drawback is uncertain."  *Id.* at 7.

Commerce asserts that most countries permit substitution of inputs, which means that,

"while the actual imported material subject to duty is fungible and can be consumed in

any of the finished goods, it is assigned by the company to exported finished goods for

purposes of the program."  *Id.*  Thus, while the statute requires Commerce to increase

U.S. price to account for the duties exempted by reason of exportation, there is a lesser

amount of (or no) import duties reflected in normal value.  *Id.* at 7–8.  Commerce

provided "the following example, wherein one unit of input is domestically sourced for

$10 and one unit of input is imported for $10, plus a $5 duty":

> Under the standard way of determining costs for general accounting
> purposes, the company's average cost for the inputs per unit is the
> domestic input of $10 plus the imported input of $15 ($10 + $5) divided by
> two units of input which equals $12.50 (*i.e.*, $10 + $15 = $25 and $25/2 =
> $12.50).  Thus, $12.50 is the annual average per-unit input cost, including
> only $2.50 of the import duty for each unit.  However, upon export of one
> unit of the finished good, the duty drawback scheme allows the entire $5
> of import duties to be rebated or forgiven.  As a result, following this logic,
> the adjusted U.S. price reflects $5 per unit of duties, while the [normal
> value] cost of production includes an average of $2.50 per unit.  This
> creates an imbalance in the amount of duties on each side of the dumping
> equation, artificially lowering the margin by $2.50 of duties (assuming
> through the cost test the average home market [] price would include the
> $2.50 of duties in the cost of the input).

*Id*. at 8.

As discussed, Commerce initially attempted to remedy this perceived distortion by limiting the duty drawback adjustment to the amount of duties imputed on the cost-side.  *Id.* at 9.  In response to several opinions from this court holding that the reduced duty drawback adjustment was unlawful, Commerce developed a new methodology.  *See id.* at 9–10 & n.36 (collecting cases).  Specifically, in those cases, Commerce applied the full duty drawback adjustment to U.S. price, applied the cost-side adjustment pursuant to *Saha Thai*, and also made a COS adjustment to normal value— ultimately imputing the same amount of per-unit duties to normal value that were added to U.S. price.  *Id.* at 10.  In other words, using the example above, Commerce added (1) $5 per unit of import duties to U.S. price; (2) $2.50 per unit to cost; and (3) $2.50 per unit to normal value as a COS adjustment.  *Id.*

Upon review by another judge of this court, the court determined that the agency improperly double-counted the amount of duties included within normal value.  *Id.* at 10 & n.38 (citing *Uttam Galva Steels Ltd. v. United States*, 43 CIT ___, ___, 374 F. Supp. 3d 1360, 1364 (2019)).  Taking that court opinion into account, while also asserting that the double-counting finding was in error, Commerce further changed its methodology in this case to provide for two COS adjustments: the first COS adjustment removes all duties from normal value and the second COS adjustment "add[s] to the normal value the same per-unit amount of duty added to U.S. price."  *Id.* at 14.  Commerce explained that the second COS adjustment is necessary because:

> (1) . . . the import duty program and drawback provision impose a different set of accounting and duty treatments dependent upon which market the finished good was sold and the markets from which the imported input is

> sourced; and (2) the effect of the different sourcing of inputs and
> associated duty costs, and how the duty drawback is treated for the U.S.
> and home market sales.

*Id.* at 13.  The combined effect of a duty exemption scheme and domestic sourcing of

inputs for foreign-like product sold in the home market, according to Commerce, is to

"permit[] the assignment of imported inputs and the associated import duties to export

sales, while attributing the domestic purchases exclusive of duty to domestic sales."  *Id.*

at 14.  This treatment differs "from standard cost accounting and the respondent's

normal books and records, which calculate an annual weighted-average price of inputs

and is allocated to overall production versus market-specific production."  *Id.*  According

to Commerce, this results in a duty-inclusive U.S. price being compared to a normal

value that reflects less or no duties.  *Id.*

In the 2nd Remand Results at issue here, Commerce explained that it did not

make the first COS adjustment to remove booked duties because Çolakoğlu

participated in a duty exemption program and, thus, constructed value and home market

prices are duty-exclusive.  *See id.* at 15.  Commerce did, however, make the second

COS adjustment to add to normal value the same per-unit amount of duties the agency

added to U.S. price, "ensuring that both sides of the dumping equation contain the same

amount of per-unit import duties."  *Id.* at 14.[9]

---

[9] Commerce did not impute exempted import duties to the cost of production as would
be consistent with *Saha Thai*.  *See* 2nd Remand Results at 13, 15.  Instead, Commerce
made a COS adjustment to normal value (regardless of whether it was based on home
market sales or constructed value).  *Id.* at 16.

In the remand proceeding, Çolakoğlu challenged Commerce's reliance on its

authority to adjust normal value pursuant to the circumstance of sale provision.  *See id*

at 20.  Commerce explained that it made the COS adjustment "to account for

differences not otherwise accounted for in the statute."  *Id.* at 25.

The normal value provision of the statute gives Commerce the authority to

increase or decrease normal value "by the amount of any difference (or lack thereof)

between" U.S. price and normal value, "other than a difference for which allowance is

otherwise provided under this section," that Commerce determines is "wholly or partly

due to . . . other differences in the circumstances of sale."  19 U.S.C.

§ 1677b(a)(6)(C)(iii).  Commerce explained that the COS provision is the only provision

that "address[es] differences in the home market price relating to import duties," by

which Commerce means "taxes imposed only on particular inputs, at particular rates,

from particular markets, input into particular goods, which can be claimed and rebated

only when resold to particular markets."  2nd Remand Results at 25.  In this case,

Commerce explained, Çolakoğlu imports substitutable inputs that "incur import duties at

different rates, (or not at all), while the domestically sourced identical inputs incur no

duties."  *Id*.  The Turkish duty drawback scheme permits Çolakoğlu "to assume that the

exported product consumed the inputs subject to duties," and the duty drawback

provision, 19 U.S.C. § 1677a(c)(1)(B), likewise "implies that imported inputs . . . subject

to import duties . . . were consumed in making the exported products."  *Id.*  Commerce

described the different "circumstance of sale" as the assignment of duty costs to

particular products "based on where they are sold."  *Id.* at 26.

As Commerce explains it, the agency confronted the following: (1) the requirement to increase U.S. price to account for import duties foregone by reason of exportation of the subject merchandise in order "to make a fair price comparison" to a normal value that is "presumably set to recover such import duties" on goods sold domestically; (2) a normal value that does not contain any import duties because dutiable inputs are allocated to export sales; and (3) a statute that is silent on what Commerce should do in that situation.  *Id.* at 25.  Commerce determined that "[t]he 'other differences in the circumstances of sale' provision is the only means" at its disposal "to ensure a fair comparison" between a duty-exclusive normal value and duty-inclusive U.S. price.  *Id.* at 26.

### C. Commerce's COS Adjustment Contravenes the Plain Language of the Applicable Statute and Regulation

Çolakoğlu raises several challenges to Commerce's 2nd Remand Results, foremost of which is that the statutory COS provision, along with Commerce's implementing regulation, do not justify an offset to the statutory duty drawback adjustment.  Çolakoğlu's Cmts. at 10–12.  The court agrees.  *See Habaş*, 2019 WL 5270152, at *6–11.

Congress authorized Commerce to adjust normal value for differences between normal value and U.S. price that are not otherwise provided for in the statute and are due to "other differences in the circumstances of sale."  19 U.S.C. § 1677b(a)(6)(C)(iii). In the Statement of Administrative Action ("SAA") accompanying the Uruguay Round

Agreements Act, Pub. L. No. 103-465, § 224, 108 Stat. 4809 (1994), Congress

explained that:

> Commerce will continue to employ the circumstance-of-sale adjustment to
> adjust for differences in direct expenses and differences in selling
> expenses of the purchaser assumed by the foreign seller, between normal
> value and both export price and constructed export price. . . .  [D]irect
> expenses and assumptions of expenses incurred in the foreign country on
> sales to the affiliated importer will form a part of the circumstances of sale
> adjustment.

Uruguay Round Agreements Act, Statement of Administrative Action, H R. Doc. No.

103-316, vol. 1, at 828 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4167.[10]  Consistent

with the SAA, Commerce's regulations limit COS adjustments consistent with 19 U.S.C.

§ 1677b(a)(6)(C)(iii) to "direct selling expenses and assumed expenses," with one

exception for commissions paid in one market that is not relevant here.  19 C.F.R.

§ 351.410(b) (providing for COS adjustments "only for direct selling expenses and

assumed expenses").  Direct selling expenses are defined as "expenses, such as

commissions, credit expenses, guarantees, and warranties, that result from, and bear a

direct relationship to, the particular sale in question."  *Id.* § 351.410(c).  Assumed

expenses are defined as "selling expenses that are assumed by the seller on behalf of

the buyer, such as advertising expenses."  *Id.* § 351.410(d).

According to Çolakoğlu, "[n]othing in the law, regulations, or past cases suggests

that import duties that have not been collected—on inputs destined for export sales—

---

[10] The SAA "shall be regarded as an authoritative expression by the United States
concerning the interpretation and application of the Uruguay Round Agreements and
this Act in any judicial proceeding in which a question arises concerning such
interpretation or application."  19 U.S.C. § 3512(d).

qualify as a COS, let alone as a selling expense."  Çolakoğlu's Cmts. at 11.  Çolakoğlu

further argues that the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit")

has determined that a COS adjustment may not be made to "nullify a U.S. price

adjustment."  *Id.* at 12 (citing *Zenith Electronics Corp. v. United States*, 988 F.2d 1573,

1581 (Fed. Cir. 1993)).

　　　The Government argues that "Turkey's duty drawback scheme and the statutory

duty drawback provision[] . . . transformed the import duties subject to the duty

drawback scheme into a direct selling expense."  Gov't Reply Cmts. at 10 (citing 2nd

Remand Results at 15 & n.49).  The Government further argues that Commerce's COS

adjustment is authorized by the statutory requirement to ensure a "fair comparison"

between U.S. price and normal value.  *Id.* at 9 (citing 19 U.S.C. § 1677b(a)); *see also id.*

at 12.  The Government also argues that Commerce's methodology is not precluded by

the *Zenith* line of cases.  *Id.* at 12–13.

　　　Defendant-Intervenors argue that Çolakoğlu treats imports duties as "akin to

selling expenses" and, thus, Commerce's COS adjustment complies with the agency's

regulation.  Def.-Ints.' Reply Cmts. at 15–16; *see also id.* at 16 ("[I]ncurring import duties

and the exemption or rebate of those duties is an economic activity that occurs in the

home market.").  Defendant-Intervenors concur with the Government that the COS

adjustment furthers the statutory purpose of making a fair comparison.  *Id.* at 15.

　　　Commerce's COS adjustment to normal value contravenes both the statutory

provision and the agency's implementing regulation.  Beginning with the statute, the

court's review of Commerce's interpretation and implementation of a statutory scheme

is guided by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  First, the court must determine "whether Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  If Congress's intent is clear, "that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842–43.  Only "if the statute is silent or ambiguous," must the court determine whether the agency's action "is based on a permissible construction of the statute."  *Id.* at 843.  The court may find that "Congress has expressed unambiguous intent by examining 'the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'"  *Gazelle v. Shulkin*, 868 F.3d 1006, 1010 (Fed. Cir. 2017) (quoting *Heino v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012)).

Commerce determined that adjustments to normal value pursuant to 19 U.S.C. § 1677b "do not address differences in the home market price relating to import duties other than through the COS provision," 2nd Remand Results at 25, and "the 'other differences in the circumstances of sale' provision is the only means to ensure a fair comparison," *id.* at 26.  Notwithstanding Commerce's claims, the statutory COS provision "is not an omnibus provision to be used . . . for whatever adjustment [the agency] seek[s] to effect."  *Zenith Electronics Corp. v. United States*, 14 CIT 831, 837, 755 F. Supp. 397, 406 (1990).

This more limited understanding of the COS provision is confirmed by the legislative history.  The Senate report accompanying the enactment of the COS provision lists as adjustable differences "terms of sale, credit terms, and advertising and

selling costs," all of which are attendant to the sale of the merchandise.  S. Rep. No. 85-

1619, at 7 (1958).  When Congress enacted the URAA, including section 1677b in its

current form, it intended for "Commerce's current practice with respect to [the COS]

adjustment to remain unchanged" (with the exception of the "constructed export price

offset" that is not relevant here).  SAA at 828, *reprinted in* 1994 U.S.C.C.A.N. at 4167.

Prior to enactment of the URAA, Commerce's COS regulation provided that differences

in the circumstances of sale for which it would "make reasonable allowances normally

[were] those involving differences in commissions, credit terms, guarantees, warranties,

technical assistance, and servicing," in addition to "differences in selling costs (such as

advertising) incurred by the producer or reseller" generally to the extent those costs

were assumed "on behalf of the purchaser."  19 C.F.R. § 353.56(a)(2) (1990).

Although the examples listed in the regulation and legislative history are not

exhaustive, they are all examples of "expenses made to support and promote sales."

*Torrington Co. v. United States*, 156 F.3d 1361, 1366 (Fed. Cir. 1998) (Archer, J.,

dissenting) (disagreeing that certain freight costs constituted selling expenses).

Adjustments for these types of selling expenses are necessary in order to compare

normal value and U.S. price "at a similar point in the chain of commerce."  *Maverick

Tube Corp. v. Toscelik Profil*, 861 F.3d 1269, 1274 (Fed. Cir. 2017) (citation omitted).

Commerce's adjustment for an asserted difference in duty costs arising from Plaintiffs'

different sourcing of inputs and the statutory duty drawback adjustment pursuant to 19

U.S.C. § 1677a(c)(1)(B) is not a circumstance surrounding the sale of the merchandise.

Notwithstanding Commerce's strained attempt to describe its method using terms

relevant to a COS adjustment, Commerce, in fact, made the adjustment to remedy what

it characterized as a distortion[11] that arose by operation of the statutory drawback

adjustment on a particular set of facts.  *See* 2nd Remand Results at 8, 11, 22.  In so

doing, Commerce directly and completely nullified the duty drawback adjustment to U.S.

price by adding to normal value the same per-unit amount of exempted duties added to

U.S. price.  *Id.* at 14.  Commerce may not, however, use the COS provision to

"effectively writ[e] [a separate adjustment] section out of the statute."  *Zenith*, 988 F.2d

at 1581.[12]

Commerce's circumvention of the statutory scheme cannot be saved by its

appeal to the need "to ensure a fair comparison."  2nd Remand Results at 14, 15, 26; *cf.*

---

[11] In *Erdemir II*, the court noted that Commerce's concern regarding distortion is based
on the unsubstantiated assumption that "the cost of the domestically-sourced inputs
approximates the import duty-exclusive cost of the foreign-sourced input."  357 F. Supp.
3d at 1334 n.15 (emphasis omitted).  The court observed that a domestic supplier of a
dutiable input "would price its product at a level competitive with the duty-inclusive cost
of the imported input," and, that "[i]n such a scenario, it is difficult to understand the
margin effect of a proper duty drawback adjustment as distortive."  *Id.*  Commerce's
explanation of the distortion that arises by operation of the duty drawback adjustment in
the 2nd Remand Results indeed assumes that domestically-sourced and foreign-
sourced inputs share the same unit price ($10) without regard to any market effect from
the 50 percent duty in Commerce's example.  2nd Remand Results at 8.  Commerce
does not explain why this is so, nor does Commerce address the court's observation in
the 2nd Remand Results and the record does not otherwise support the agency's
assumption.  *See id.*

[12] Çolakoğlu and the Government disagree on the applicability of *Zenith* to the court's
review of Commerce's determination here.  *See* Çolakoğlu's Cmts. at 12; Gov't Reply
Cmts. at 12–13; *cf.* 2nd Remand Results at 22–25.  While *Zenith* addressed
Commerce's use of a COS adjustment to remedy the effect on the antidumping margin
of a separate pre-URAA statutory provision relating to domestic taxes, the court's
statements regarding Commerce's authority pursuant to the COS provision remain
instructive, if not binding, here.  *See Zenith*, 988 F.2d at 1580–82.

Gov't's Reply Cmts. at 9, 12; Def-Ints.' Reply Cmts. at 15.  Section 1677b requires that

"a fair comparison shall be made between the export price or constructed export price

and normal value."  19 U.S.C. § 1677b(a).  As the Federal Circuit has recognized, the

statute expressly sets out how to determine normal value "[i]n order to achieve a fair

comparison with the export price or constructed export price."  *Timken Co. v. United*

*States*, 354 F.3d 1334, 1344 (Fed. Cir. 2004) (characterizing the enumerated

requirements and adjustments to normal value in subsections 1677b(a)(1)–(8) as

"exhaustive").  Thus, the "fair comparison" requirement is met when normal value is

calculated in accordance with the statute and does not provide Commerce with

additional authority to make adjustments "beyond those explicitly established in the

statute."  *Id.; cf. Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1313 (Fed. Cir.

2001) (when U.S. price is based on constructed export price, a "fair comparison" to

normal value is achieved by making statutory adjustments in order to arrive at the

appropriate level of trade).  Commerce itself made this point when it promulgated the

rule in its current form.  *See Antidumping Duties; Countervailing Duties*, 61 Fed. Reg.

7,308, 7,346 (Dep't Commerce Feb. 27, 1996) (proposed rule) (explaining that the

statute and the Antidumping Agreement "specify in detail the methods by which [the

fairness] requirement is satisfied" and declining to inure to itself the authority to go

further).

Throughout the almost 25 years of administration and litigation pursuant to the

Uruguay Round Agreements Act version of the Tariff Act of 1930, and in the years that

preceded, parties have argued for and against various extra-statutory adjustments as

necessary to a "fair comparison" or allowing for "an apples-to-apples" comparison.

Generally speaking, domestic interested parties have asserted that certain adjustments

leading to higher dumping margins are needed to be fair, and respondent interested

parties have asserted that other adjustments leading to lower dumping margins are

needed to be fair.  However, where, as here, Congress has provided for an adjustment

in one part of the dumping calculation and not another, it is not for Commerce or the

court to circumvent the legislative framework even if the purported goal is to render an

allegedly fairer comparison.  *See, e.g.*, *Ad Hoc Comm. of AZ-NM-TX-FL Prods. of Gray

Portland Cement v. United States*, 13 F.3d 398, 401–03 (Fed. Cir. 1994).  Accordingly,

Commerce's COS adjustment to offset the effect of the statutory duty drawback

adjustment must be rejected as inconsistent with the statute.[13]

　　　While regulatory consistency cannot save an adjustment otherwise inconsistent

with the statute, the court notes that Commerce's COS adjustment also contravenes the

plain language of its regulation.[14]  The Federal Circuit has held that Commerce's

---

[13] Defendant-Intervenors' reliance on *Budd Co., Wheel & Brake Div. v. United States*,
14 CIT 595, 599–603, 746 F.Supp. 1093, 1097–1100 (1990), to support the proposition
that Commerce may make a COS adjustment generally to remedy "an imbalance in the
dumping calculation" is unpersuasive.  *See* Def.-Ints.' Cmts. at 15.  In *Budd Co.*, the
court upheld a COS adjustment intended to remedy currency fluctuations that resulted
from Commerce's application of its currency conversion regulations.  14 CIT at 602–07,
746 F. Supp. at 1099–1103.  *Budd Co.* is factually inapposite, non-binding, and
predates several Federal Circuit opinions cited herein, including *Zenith*, *Timken Co.*,
and *Ad Hoc Committee of AZ-NM-TX-FL Producers*, which discuss in detail
Commerce's authority to make COS adjustments and obligation to render a "fair
comparison."  Accordingly, the court adheres to those authorities.
[14] Commerce's regulation provides for a COS adjustment "only for direct selling
expenses and assumed expenses."  19 C.F.R. § 351.410(b).  While Commerce did not
specify which of the two categories it considered the adjustment at issue to fall within, it

identification of a particular cost as a "selling expense[] properly the subject of a COS

adjustment" represents an instance of the agency "simply interpreting its own

regulations" to which the court owes "substantial deference." *Torrington Co.*, 156 F.3d

at 1364 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *see also*

*Auer v. Robbins*, 519 U.S. 452, 461–62 (1997) (according deference to an agency's "fair

and considered" interpretation of its own ambiguous regulation).  More recently,

however, the U.S. Supreme Court cautioned that "a court should not afford *Auer*

deference unless the regulation is genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct.

2400, 2415 (2019).  "[B]efore concluding that a rule is genuinely ambiguous, a court

must exhaust all the 'traditional tools' of construction." *Id.* (quoting *Chevron*, 467 U.S. at

843 n.9).  Those "tools" consist of "the text, structure, history, and purpose of a

regulation." *Id.*

Turning first to the plain language of the regulation, the court must "consider the

terms in accordance with their common meaning." *Mass. Mut. Life Ins. Co. v. United*

*States*, 782 F.3d 1354, 1365 (Fed. Cir. 2015) (quoting *Lockheed Corp. v. Windnall*, 113

F.3d 1225, 1227 (Fed. Cir. 1997)).  A "direct selling expense" must be (1) an "expense[]"

that (2) "result[s] from, and bear[s] a direct relationship to, the particular sale in

question."  19 C.F.R. § 351.410(c).  Commerce's regulation includes "commissions,

---

sought to explain why certain "duty costs" "are directly related to the sales in different
markets."  2nd Remand Results at 26.  From this the court discerns that Commerce
considers the COS adjustment to fall within the category for direct selling expenses.
*See* 19 C.F.R. § 351.410(c) (defining "direct selling expenses" as expenses "that result
from, and bear a direct relationship to, the particular sale in question").

credit expenses, guarantees, and warranties" as examples of direct selling expenses. *Id*. All of these examples involve an actual or imputed expenditure by the respondent.[15]

Commerce's determination in the remand proceeding is inconsistent with the plain language of the regulation and, thus, merits no deference. Commerce's adjustment for differences in import duties, *see* 2nd Remand Results at 13–14, 25, ignores the fact that Çolakoğlu "*did not incur and record any actual duty costs* in its normal books and records. Rather, an 'off-the-books' liability was generated when inputs were imported under the IPR program, *and that liability was later reversed* upon exportation of subject merchandise to the United States and other markets." *Id.* at 15 (emphasis added); *see also id.* ("Çolakoğlu *did not pay* or record as a cost *any duties* associated with the IPR exemption program.") (emphasis added). Here, the record is clear that Çolakoğlu incurred *no expense* respecting import duties on inputs consumed in the production of subject merchandise. *See id.*

Commerce focused on the fact that U.S. price is ultimately duty-inclusive as the basis for the COS adjustment; however, such is the case by operation of the duty drawback adjustment. *Id.* at 25–26. Commerce offers no explanation as to how a statutory adjustment to U.S. price constitutes an "expense" as the term is commonly understood or, indeed, a circumstance of sale. The duty drawback adjustment resulted

---

[15] Credit expenses are typically imputed expenses for the seller, representing the time value of money for the period between shipment and payment. *See generally* Import Admin. Policy Bulletin 98.2: Imputed Credit Expenses and Interest Rates (Feb. 23, 1998), *available at* https://enforcement.trade.gov/policy/bull98-2.htm (last visited Oct. 24, 2019). Such expenses recognize the value to the buyer, and the cost to the seller, of extending payment terms. *Id.*

from the operation of law, it was not incurred as part of the sales process.  When

Commerce promulgated the current rule, it explicitly rejected drafting the regulation "in

such a way as to essentially function as a catch-all provision to achieve 'fairness,'"

finding the approach inconsistent with the carefully crafted statutory scheme.[16]

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. at 7,346.  In attempting to do

so now, Commerce has done what the Supreme Court said it could not do: "creat[ing]

*de facto* a new regulation" "under the guise of interpreting a regulation."  *Kisor*, 39 S. Ct.

at 2415 (citation omitted).

---

[16] The court is concerned by the Government's misleading alteration of the regulation in its reply comments, to wit: "The regulations further clarify that '[i]n general . . . the Secretary will make circumstance of sale adjustments . . . only for direct selling expenses and assumed expenses.'"  Gov't's Reply Cmts. at 10 (alterations in original) (quoting 19 C.F.R. § 351.410(b)).  The Government's alteration suggests that the phrase "in general" forms part of the sentence describing the adjustments made pursuant to the regulation in such manner that it appears to broaden the scope of the regulation.  The regulation actually provides:
> (b) In general. With the exception of the allowance described in paragraph (e) of this section concerning commissions paid in only one market, the [agency] will make circumstances of sale adjustments under [19 U.S.C. § 1677b](6)(C)(iii) . . . only for direct selling expenses and assumed expenses.

19 C.F.R. § 351.410(b).  Thus, the phrase "In general" is the heading to subsection (b), not part of the text.  Rather than speaking to the scope of the permissible adjustments, it speaks to the scope of the regulation, which, with the exception of certain commissions, permits adjustments "*only* for direct selling expenses and assumed expenses."  *Id.* (emphasis added).  It is a well-settled interpretive rule that "the heading of a section . . . cannot undo or limit that which the text makes plain."  *Brotherhood of R. R. Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 529 (1947) (construing a statute); *see also Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1316 (Fed. Cir. 2017) (principles of statutory interpretation apply likewise to regulations).  The Government's alteration, which seeks to negate the explicit limitation the word "only" places on the types of permissible adjustments, is therefore misleading and erroneous.

Commerce's reliance on *Saha Thai* to support the agency's use of a COS adjustment also fails.  *See* 2nd Remand Results at 24 ("Moreover, . . . the Federal Circuit in *Saha Thai* ruled that Commerce has the authority to adjust [normal value] when the duties at issue are not paid or included in a respondent's books and records.").  In *Saha Thai*, the Federal Circuit affirmed Commerce's interpretation of cost-related provisions of the normal value statute to include "implied costs" (i.e., unbooked/exempted duty costs) as well as "actual costs" for purposes of calculating a duty-inclusive normal value to compare to a U.S. price subject to the duty drawback adjustment.  635 F.3d at 1342–43.  In contrast to the cost-side adjustment affirmed in *Saha Thai*, the COS provision adjusts normal value even when normal value is based on home market sales and that sales price is greater than the cost of production.  *See* 19 U.S.C. § 1677b(a)(1)(B), (a)(6)(C)(iii), (b)(1).  This approach is distinct from *Saha Thai* because it presumes that a theoretical duty liability has a price effect on home market sales.  Such a presumption is contrary to the *Saha Thai* court's observation that "[a]n import duty exemption granted only for exported merchandise has *no* effect on home market sales prices" and, thus, "the duty exemption should have *no* effect on [normal value]."  635 F.3d at 1342 (emphasis added).  Thus, while Commerce properly may include exempted duties in its *cost* calculations, *id.* at 1342–43, *Saha Thai* cannot support a COS adjustment to price-based normal value.  Accordingly, the court finds that Commerce's COS adjustment is also barred by the unambiguous language of the

regulation.[17]  This issue will be remanded to the agency for reconsideration consistent with the foregoing.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's 2nd Remand Results are remanded; it is further

**ORDERED** that, on remand, Commerce shall, consistent with this Opinion, recalculate normal value without making a circumstance of sale adjustment related to the duty drawback adjustment made to export price (or constructed export price; it is further

**ORDERED** that Commerce shall file its remand redetermination on or before 1/27/2020; it is further

---

[17] Because the court finds that Commerce's COS adjustment was contrary to the relevant statutory and regulatory provisions, it need not resolve Çolakoğlu's remaining challenges to the adjustments.  The court finds, however, that Çolakoğlu's argument that Commerce failed to comply with the court's instruction in *Erdemir II* regarding the appropriate denominator to use in calculating the duty drawback adjustment lacks merit. *See* Çolakoğlu's Cmts. at 3–4.  To support this argument, Çolakoğlu cites Commerce's amended final calculation memoranda from the first and second remand proceedings. *See id.* at 4 (citing Draft Results of Second Redetermination Pursuant to Second Remand of Certain Hot-Rolled Steel Products from the Republic of Turkey: Am. Final Calculation Mem. for Çolakoğlu Dis Ticaret A.S. and its Affiliates (May 8, 2019) ("Çolakoğlu Calc. Mem.") at 3, 2nd CRR 1, CRJA Tab 8; Final Results of Redetermination Pursuant to Remand of Certain Hot-Rolled Steel Products from the Republic of Turkey: Am. Final Calculation Mem. for Çolakoğlu Dis Ticaret A.S. and its Affiliates (July 20, 2018) at 2–4, 1st CRR 41, CRJA Tab 6).  The calculation memorandum relevant to the second remand proceeding shows that Commerce adjusted U.S. price in accordance with Çolakoğlu's self-reported duty drawback variable, Çolakoğlu Calc. Mem. at 3, which Çolakoğlu calculated by dividing exempted duties by total export quantity, 2nd Remand Results at 17.  Thus, Commerce complied with the court's instruction in this regard.

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule

56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000

words.


/s/      Mark A. Barnett____
Mark A. Barnett, Judge


Dated: October 29, 2019_____
      New York, New York